## STATE of Wisconsin, Plaintiff-Respondent,

v.

## Robert Donald REWOLINSKI, Defendant-Appellant-Petitioner.

Supreme Court

*No. 88-2312-CR. Argued September 5, 1990.—Decided December 20, 1990.*

(Also reported in 464 N.W.2d 401.)

4

ABRAHAMSON, J., dissents.
BABLITCH, J., AND HEFFERNAN, C.J., dissent.

For the defendant-appellant-petitioner there were briefs by *Brady C. Williamson, Jeffrey J. Kassel* and *LaFollette & Sinykin,* Madison and oral argument by *Mr. Williamson.*

For the plaintiff-respondent the cause was argued by *Sally Wellman,* assistant attorney general, with whom on the briefs was *Donald J. Hanaway,* attorney general.

STEINMETZ, J. The issues in this case are several:

(1) Does a criminal defendant bear the burden of establishing both that he manifested a subjective expec-

6

tation of privacy that was allegedly invaded by government action and that that expectation was legitimate?

(2) Did the defendant have a legitimate expectation of privacy in the conversations or in the TDD[1] printout tape that recorded those conversations when his call to the victim, Catherine Teeters, and the victim's call to him occurred while he was in the dispatch area of the sheriff department's office, using the sheriff department's TDD, in the presence and line of vision of sheriff department personnel?

(3) Even if the defendant had a legitimate expectation of privacy, was the police conduct reasonable in light of the facts and circumstances of this case such that the police conduct did not violate defendant's constitutional rights?

(4) If the trial court committed an error in admitting evidence about certain statements defendant made to Catherine Teeters and statements she made to him, was that error harmless?

(5) Should the court remand the case for an evidentiary hearing?

We conclude that Robert Rewolinski did not have a reasonable expectation of privacy that was invaded by

---

[1]TDD is a term used to describe for telecommunications device for the deaf. A TDD is a device used by deaf people to communicate over ordinary telephone lines. It functions by sending and receiving computerized signals that correspond to the user's pressing of letters on a keyboard similar to that of a typewriter. By typing a series of letters, a user forms words and sentences that then are transmitted to a party on the other end of the line. That party must also be using a TDD in order for communication to take place. A simultaneous electronic readout of the messages sent and received is displayed on a screen on each of the respective TDD's and completes the basic communication process.

government action. Furthermore, we conclude that even if he had such an expectation of privacy, the police conduct was reasonable in light of the total facts and circumstances of this case, including the defendant's deafness, and therefore there was no constitutional violation. Even if there were a constitutional violation, it constituted harmless error. Finally, Rewolinski is deemed to have waived his rights under sec. 971.31, Stats.[2] No remand of the case for a hearing is necessary. Thus, we affirm the unpublished opinion of the court of appeals which affirmed the Pierce county circuit court, Judge Robert W. Wing, presiding.

---

[2]Section 971.31, Stats., provides, in relevant part:

**Motions before trial.** (1) Any motion which is capable of determination without the trial of the general issue may be made before trial.

(2) Except as provided in sub. (5), defenses and objections based on defects in the institution of the proceedings, insufficiency of the complaint, information or indictment, invalidity in whole or in part of the statute on which the prosecution is founded, or the use of illegal means to secure evidence shall be raised before trial by motion to be deemed waived. The court may, however, entertain such motion at the trial, in which case the defendant waives any jeopardy that may have attached. The motion to suppress evidence shall be so entertained with waiver of jeopardy when it appears that the defendant is surprised by the state's possession of such evidence.

(3) The admissibility of any statement of the defendant shall be determined at the trial by the court in an evidentiary hearing out of the presence of the jury, unless the defendant, by motion, challenges the admissibility of such statement before trial.

(4) Except as provided in sub. (3), a motion shall be determined before trial of the general issue unless the court orders that it be deferred for determination at the trial. All issues of fact arising out of such motion shall be tried by the court without a jury.

(5)(a) Motions before trial shall be served and filed within 10 days after the initial appearance of the defendant in a misdemeanor action or 10 days after arraignment in a felony action unless the court otherwise permits.

Robert Rewolinski killed Catherine Teeters on the evening of June 9, 1987, at their home near Prescott, in Pierce county. Both deaf and unable to speak, they had been living together for six years, raising their two children. Rewolinski admitted committing the acts that caused Teeters' death. The facts show that he strangled her after she told him that he was an "unfit father," that he would not be able to see their children in the future, and that he must move out of the house. The jury had to choose between first-degree murder and manslaughter and, after a six-day trial, found Rewolinski guilty of murder.

Teeters' body was found with her head submerged in a partially filled bathtub with a belt around her neck. Ligature strangulation was determined to be the cause of death. After the killing, Rewolinski summoned police personnel to the house. "I lost my mind," he stated, claiming he killed Teeters in the heat of passion after Teeters' remarks to him that evening, even though he had already known that Teeters was having an ongoing affair with another man.

Earlier on the day of the killing, Rewolinski had been arrested by a state patrol officer for operating a motor vehicle with a suspended operator's license. He was then taken to the Pierce county sheriff department's office. After being released, Rewolinski asked department personnel if he could use the TDD at the department office to make a telephone call in order to arrange for a ride. Department personnel agreed to his request to use the device, although they were not obligated to do so.

The sheriff department's TDD displayed transmissions in one-half inch tall format on a simultaneous electronic readout. The device also had a memory feature which recorded transmissions, although the record does not set forth the capabilities and operation of the mem-

ory feature. In addition, the device had the capacity to create a type-written printout of all transmissions it would send and receive. A person using the device could press a privacy button so that no printout of the conversation would be created. The record does not show whether the defendant knew of the existence of this button or of its purpose, although it does indicate that the privacy button was operational.

Rewolinski and Teeters had a TDD at their house that was similar in design and operation to the sheriff department's TDD. Like the sheriff department's TDD, the Rewolinski-Teeters' TDD emitted a simultaneous electronic readout of all transmissions. However, the record does not indicate whether the Rewolinski-Teeters' TDD was able to create a printout and, if so, whether there was a privacy button.

The sheriff department's TDD was located in the dispatch area of the office, an area of restricted access. In order for Rewolinski to use the device, department personnel had to unlock a door through which Rewolinski then passed in order to get to the device in the dispatch area. Once in that area, Rewolinski was in the presence and line of vision of department personnel who observed his behavior as he used the device.

Rewolinski used the device to call Teeters for a ride. A short time later, she called back to him at the department. During the two conversations, a printout was created because Rewolinski did not press the button that would have limited the machine to displaying the non-permanent readout on the screen. After the second conversation had been completed, Rewolinski ripped the printout of the conversations from the TDD and started to exit the office with the printout bundled in his hand. The dispatcher, Deputy Sheriff Sandra Roed, told him to stop and surrender the printout to her. When he

refused to surrender the printout, the dispatcher forced open Rewolinski's hand and removed it from his possession. She did not read the printout at the time because she was busy with her regular dispatch duties, but, set it aside for logging at a later time.

The contents of the printout refer to Rewolinski's previous physical assault on Teeters and her fear of him. The printout records her statement that "I am scared to death that you will make us die in [a] car accident." The printout also reflects the fact that she made Rewolinski promise before she would pick him up that he would not hurt her or the children. The trial court allowed the printout into evidence, and the prosecution offered limited testimony as to the contents of the printout. The printout tape itself was not presented to the jury at any time.

The defendant contends that he has been the subject of an illegal search and seizure under Article I, sec. 11 of the Wisconsin Constitution and the Fourth Amendment of the United States Constitution. He claims that the trial court erred by admitting the printout of his TDD communications with the victim and allowing testimony as to the contents of the printout. He claims that these communications are constitutionally protected from interception, arguing that he as a party to a conversation carried out via a TDD had the same reasonable expectation of privacy as would a telephone user relying on *Katz v. United States,* 389 U.S. 347, 362 (1967).[3] He further claims the government conduct was unreasonable and harmful error for the trial

---

[3]In *Katz,* 389 U.S. at 353, the Court held a search and seizure occurred when the government electronically listened to and recorded a criminal defendant's words by "bugging" a public telephone booth, because it "violated the privacy upon which he justifiably relied while using the [public] telephone booth."

judge to admit the printout evidence. Finally, the defendant asks for reversal or remand for a statutory hearing on the TDD evidence.[4]

Whether police conduct constitutes an unreasonable search and seizure in violation of the state and federal constitutions[5] depends, in the first place, on whether the defendant had a legitimate, justifiable or reasonable expectation of privacy that was invaded by the government action.[6] *See Smith v. Maryland,* 442 U.S. 735, 740 (1979); *Illinois v. Andreas,* 463 U.S. 765, 771 (1983); *State v. Stevens,* 123 Wis. 2d 303, 316, 367 N.W.2d 788 *cert. denied,* 474 U.S. 852 (1985); *State v. Fillyaw,* 104 Wis. 2d 700, 715, 312 N.W.2d 795 (1981), *cert. denied* 455 U.S. 1026 (1982). It is worth emphasizing that the constitutionality or reasonableness of the government conduct does not come into question unless and until it is established that he had a legitimate expectation of privacy that was invaded by government conduct, *i.e.,*

---

[4]Rewolinski concedes that this case does not implicate the Wisconsin Electronic Surveillance Control Law, sec. 968.27–968.33, Stats. 1985–86.

[5]At the outset, we note that this court has said that the search and seizure provisions of the United States Constitution and Wisconsin Constitution are "identical." *Conrad v. State,* 63 Wis. 2d 616, 622, 218 N.W.2d 252 (1974). This court has "consistently and routinely conformed the law of search and seizure under the state constitution to that developed by the United States Supreme Court under the fourth amendment." *State v. Fry,* 131 Wis. 2d 153, 172, 388 N.W.2d 565 (1986), *cert. denied,* 479 U.S. 989; *State v. Thompkins,* 144 Wis. 2d 116, 135, 423 N.W.2d 823 (1988).

[6]In this regard, the terms "legitimate," "justifiable" and "reasonable" are interchangeable. *United States v. McKennon,* 814 F.2d 1539, 1543 n.5 (11th Cir. 1987).

that a search or seizure within the meaning of the fourth amendment even occurred.

■

Once it is established that the defendant was subject to a search or seizure, then the police conduct, to be constitutional, must have been reasonable. *State v. Monahan,* 76 Wis. 2d 387, 395, 251 N.W.2d 421 (1977). " 'The fundamental rule applicable to searches and seizures is that warrantless searches are per se unreasonable under the Fourth Amendment except under certain well-defined circumstances,' " quoting *State v. Bell,* 62 Wis. 2d 534, 540, 215 N.W.2d 535 (1974). *Id.* The ultimate standard under the fourth amendment is the reasonableness of the search or seizure in light of the facts and circumstances of the case. *Bies v. State,* 76 Wis. 2d 457, 468, 251 N.W.2d 461 (1977); *Cady v. Dombrowski,* 413 U.S. 433, 439 (1973).

## *REASONABLE EXPECTATION OF PRIVACY*

■ .

The determination of whether the defendant had a reasonable expectation of privacy depends on two separate questions. The first question is whether the individual by his conduct exhibited an actual, subjective expectation of privacy. The second question is whether such an expectation is legitimate or justifiable in that it is one that society is willing to recognize as reasonable. *Stevens,* 123 Wis. 2d at 316; *Smith v. Maryland,* 442 U.S. at 740; *Rakas v. Illinois,* 439 U.S. 128, 143–44 n.12 (1978).

*Burden of Proof as to Reasonable Expectation of Privacy*

■ .

A preliminary question is whether a criminal defendant bears the burden of establishing both that he mani-

13

fested a subjective expectation of privacy that was invaded by government action and that that expectation was legitimate. In this regard, the parties agree and all authority holds that the defendant bears the burden of proving that he manifested an actual, subjective expectation of privacy which he claims was violated by government conduct. Thus, the question which remains is whether the defendant also bears the burden of proving that his subjective expectation of privacy is legitimate or justifiable in that it is one that society will recognize as reasonable. We conclude that the defendant bears the burden.

In a case involving an alleged search of the curtilage of a defendant's home, this court interpreted *Katz* to hold that a defendant who wishes to invoke the protection of the fourth amendment must show, "inferentially at least, a subjective and reasonable expectation of privacy." *Conrad v. State,* 63 Wis. 2d 616, 631, 218 N.W.2d 252 (1974). In *Conrad,* neither the defendant's expectation of privacy nor the allocation of the burden of proof was at issue; the court assumed that the defendant had a reasonable expectation of privacy. *Id.* at 623. The statement in *Conrad,* as upheld by other authority, holds that a defendant bears the burden of showing that his subjective expectation of privacy was reasonable, and we agree.

The United States Supreme Court itself has stated that "the proponent of a motion to suppress has the burden of establishing that his own Fourth Amendment rights were violated by the challenged search or seizure." *Rakas,* 439 U.S. at 131 n.1. On another occasion, the Court stated that the criminal defendant "bears the burden of proving that he had a legitimate expectation of privacy" in the item allegedly searched. *Rawlings v. Kentucky,* 448 U.S. 98, 104–05 (1980).

14

The court of appeals of this state also has placed the burden on the defendant to prove both the subjective and objective prongs of the asserted expectation of privacy. In *State v. Rhodes,* 149 Wis. 2d 722, 724–25, 439 N.W.2d 630 (Ct. App. 1989), the court of appeals held a defendant "must prove his legitimate expectation of privacy in the area searched" and must show he "had a subjective expectation of privacy which society is prepared to recognize as reasonable." In *State v. Curbello-Rodriquez,* 119 Wis. 2d 414, 423, 351 N.W.2d 758 (Ct. App. 1984), the court of appeals held that the "burden is on the defendant to prove his legitimate expectation of privacy," citing *State v. Callaway,* 106 Wis. 2d 503, 520, 317 N.W.2d 428, *cert. denied* 459 U.S. 967 (1982). While these cases, along with *Rakas* and *Rawlings,* were "standing" cases, the legal principles they discussed are applicable to "was-there-a-search" cases.

This is made clear in *Florida v. Riley,* 448 U.S. 445, 109 S. Ct. 693 (1989). In *Riley,* a "was-there-a-search" case, Justice O'Connor recognized that "the defendant must bear the burden of proving that his expectation of privacy was a reasonable one, thus that a search within the meaning of the Fourth Amendment even took place." *Id.* at 699 (O'Connor, J., concurring). Moreover, the plurality clearly assumed what Justice O'Connor stated explicitly when it assumed the position of the state by reference to "the record not suggesting otherwise." *Riley,* 109 S. Ct. at 696–97.

Lower federal courts and courts in other jurisdictions also have held that the criminal defendant has the burden of proving both a subjective expectation and a legitimate expectation of privacy in "was-there-a-search" cases. In *United States v. Hershenow,* 680 F.2d 847, 855 (1st Cir. 1982), the court held the burden is on the defendant to " 'establish not only that he had a real,

subjective expectation of privacy . . ., but that this expectation, viewed objectively, was reasonable' " (quoting *United States v. Goshorn,* 628 F.2d 697, 700 (1st Cir. 1980)). *Accord State v. Michols,* 628 S.W.2d 732, 737 (Mo. Ct. App. 1982); *Hightower v. State,* 672 P.2d 671, 675 (Okla. Crim. App. 1983); *United States v. Bellina,* 665 F.2d 1335, 1340 (4th Cir. 1981).

Following these authorities, it is clear that the defendant bears the burden of proof on the question of whether his subjective expectation of privacy was reasonable. Thus, to prove that a search or seizure within the meaning of the fourth amendment occurred, a criminal defendant bears the burden of establishing both that he manifested a subjective expectation of privacy that was invaded by government action and that that expectation was legitimate. The burden of proof applicable is by a preponderance of the credible evidence. *See, State v. Edwards,* 98 Wis. 2d 367, 377, 297 N.W.2d 12 (1980); *State v. Rogers,* 148 Wis. 2d 243, 247, 435 N.W.2d 275 (1988).[7]

### *Whether a Search or Seizure Occurred*

As to whether Rewolinski had a legitimate expectation of privacy, then, the first question is whether he can establish that he had a subjective expectation of privacy. However, this question is not dispositive of the issue. That is, even if Rewolinski did have a subjective expectation of privacy—which he arguably did not—the controlling question is whether such an expectation was legitimate under the totality of the circumstances. We

---

[7]As the Court stated in *United States v. Matlock,* 415 U.S. 164, 178 n.14 (1974), the "controlling burden of proof at suppression hearings should impose no greater burden than proof by a preponderance of the evidence."

16

hold that it was not and do so regardless of the fact that Rewolinski bears the burden of proof on the question.

A legitimate expectation of privacy is an expectation which society is prepared to recognize as reasonable, *i.e.,* viewed objectively, it is justifiable under the circumstances. *Smith v. Maryland,* 442 U.S. at 740. Whether a defendant had a legitimate expectation of privacy depends upon the totality of the circumstances. *Rawlings,* 448 U.S. at 104; *State v. Cleveland,* 118 Wis. 2d 615, 633, 348 N.W.2d 512 (1984). The court must consider whether an expectation of privacy is legitimate by balancing the interest of society in permitting the government conduct to occur and the privacy interest asserted by the individual. *Hudson v. Palmer,* 468 U.S. 517, 527 (1984). The question is one of mixed fact and law. The underlying historical and evidentiary facts found by the trial court are binding on the appellate court unless they are against the great weight and clear preponderance of the evidence. But whether there was a search or seizure, *i.e.,* whether those facts and undisputed facts gave rise to a legitimate expectation of privacy on the part of the defendant is a matter of law which this court independently determines. *State v. Wisumierski,* 106 Wis. 2d 722, 734, 317 N.W.2d 484 (1982).

In *Fillyaw,* we defined the following elements as relevant, although neither controlling nor exclusive, in the determination of whether the defendant had a legitimate expectation of privacy: (1) whether the defendant had a property interest in the premises; (2) whether he was legitimately (lawfully) on the premises; (3) whether he had complete dominion and control and the right to exclude others; (4) whether he took precautions customarily taken by those seeking privacy; (5) whether he put

17

the property to some private use; and (6) whether the claim of privacy is consistent with historical notions of privacy. *Fillyaw,* 104 Wis. 2d at 712 n.6. Individually and collectively, these factors indicate that Rewolinski did not have a legitimate expectation of privacy.

First, as to a defendant's "property interest in the premises," the Supreme Court has stated that property rights alone, although not controlling, are relevant. *Rakas,* 439 U.S. at 143. In the instant case, the TDD and printout paper and ink were sheriff department property, and the TDD itself was located in the sheriff department's office. Also, whether the item is located or the conduct occurs either in a public or private place is relevant. *Katz,* 389 U.S. at 361 (Harlan, J. concurring). In this case, Rewolinski carried out his TDD conversations from the dispatch area, an area normally restricted to sheriff department personnel and occupied by department personnel at the time of the calls. Department personnel had to unlock a door to the dispatch area in order for Rewolinski to gain access to the TDD, indicating a strong department interest in the dispatch area. The location here was "public" and was pervaded by "public" presence. Rewolinski had no "property interest in the premises."

Second, as to whether Rewolinski was legitimately (lawfully) on the premises, it is noteworthy that he was no longer under arrest when he used the sheriff department's TDD to communicate with Teeters. Although he was legitimately on the premises, his presence was the result of a previous arrest and release. Thus, this *"Fillyaw* factor,"* if it favors Rewolinski at all, does so only to a very limited degree.

Third, it is clear that Rewolinski did not have "complete dominion and control and the right to exclude others" while using the sheriff department's TDD tele-

phone. He certainly could not exclude the dispatcher from the communications nerve center of the office. As noted, the dispatcher was in the dispatch area during the conversations. It was her job to be there. She could see Rewolinski and observed his behavior during the conversations. Rewolinski could not rightfully do anything about it. Unlike the defendant in *Katz,* Rewolinski was not using a public telephone that he was entitled to control. He did not request privacy; nor could he rightfully have expected any request for privacy to be granted.

Similarly, the facts show that Rewolinski had no "dominion and control." He ended the first conversation by telling Teeters that sheriff department personnel were in his presence waiting for him to conclude the conversation. He explained to her that department personnel might need to use the equipment. Then, when the call ended, he left the dispatch area. When Teeters later called back, the dispatcher received the call first and then had to escort Rewolinski back into the dispatch area and to the TDD in order for him to take the call. All of these factors indicate that Rewolinski had no "dominion and control" with respect to the dispatch area or the TDD located there.

The dissent states a search warrant should have been sought before the deputy sheriff, after the crime, read the TDD. This would have been useless since the TDD device had a memory feature which recorded transmissions as well as producing the tape. It was not necessary to obtain a search warrant to consider information in the machine belonging to the sheriff.

Fourth, as to precautions customarily taken by those seeking privacy, the Supreme Court has said that what a person "knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection." *Riley,* 109 S. Ct. at 696, quot-

ing *California v. Ciraolo,* 476 U.S. 207, 214 (1986). In this case, Rewolinski knowingly exposed the printout and readout to the dispatcher, and he did so in a place far more public than his own home or office. The dispatcher, as a practical matter, could simply have approached the TDD and read the printout, just as a passerby might overhear the words being spoken into an ordinary telephone, or she might have been able to read the one-half inch tall readout while standing off to the side at some distance. Under these circumstances, where Rewolinski voluntarily proceeded with his conversations even though the readout and printout were obviously exposed to the dispatcher, no expectation of privacy could be reasonable.

In addition, during what evidently was a lag in one of the TDD conversations, Teeters, explaining the lag to Rewolinski, told him that "Bob is talking to me." Teeters evidently was referring to Bob Orr, another adult occupant of the Rewolinski-Teeters' house who also is deaf and whose primary living quarters were in the basement of the Rewolinski-Teeters' dwelling. For all Rewolinski knew and could do, "Bob" was standing by during the entire conversations and knew their contents. Because he knowingly exposed the TDD conversations to both the dispatcher and to "Bob," Rewolinski could not have a reasonable expectation of privacy in them. *See State v. Herbest,* 551 A.2d 442, 444 (Me. 1988).

While it is true that due to his and Teeters' inability to hear or speak Rewolinski could not use an ordinary public telephone to communicate with Teeters, options other than an extended conversation with Teeters were at his disposal. He could have called Teeters on the TDD and have kept the conversations brief and to the point

20

(of needing a ride),[8] or he could have asked sheriff department personnel to place a call for him to Teeters or another person to give him a ride. The record does not show whether he asked the sheriff's department for a ride home. Nor does the record indicate that he could not have walked home on that summer afternoon, or that public conveyances could not be hired.

Fifth, Rewolinski did not "put the property to some private use." While his purpose in using the sheriff department's TDD was of a personal nature, it was in no way private. To the contrary, Rewolinski's purpose in using the device was to call for a ride, and the dispatcher, under no obligation to do so, permitted him to use the device for that purpose. That is, the dispatcher knew of Rewolinski's use of the device as well as his purpose in using it, and she knew it at the time the TDD conversations were ongoing.

Finally, as to whether "the claim of privacy is consistent with historical notions of privacy," the United States Supreme Court has said that a relevant factor is whether society as a whole possesses an understanding that an area deserves the most scrupulous protection from government intrusion. *California v. Greenwood,* 486 U.S. 35, 43 (1988); *Oliver v. United States,* 466 U.S. 170, 178 (1984). Also, the Court considers whether permitting the police conduct at issue would diminish the amount of freedom and privacy remaining to the country's citizens to a degree consistent with a free and open society. *Riley,* 109 S. Ct. at 699 (Brennan, J., dissenting); *Stevens,* 123 Wis. 2d at 334 (Heffernan, C.J., dissent-

---

[8]A brief conversation that was "to the point" would not by itself have endowed Rewolinski with a legitimate expectation of privacy. As a practical matter, however, it might have meant that the words he now claims were damaging to him never would have been spoken.

ing). Society's recognition of customary behavior and common habits in the use of domestic and business properties is also significant. *In re Deborah C.,* 30 Cal. 3d 125, 177 Cal. Rptr. 852, 635 P.2d 446, 452 (1981); *Strikes v. Chevron,* No. 89-15208 (9th Cir. 1990).

The dispatch area of a police station, by definition and necessity, is an area pervaded by government intrusion. Telephone calls placed to and from police dispatch areas are routinely monitored and recorded. *(See* n.9, *infra.)* Such operations are not inconsistent with a free and open society. The dispatch area of a police station is not an area society as a whole would view as deserving the most scrupulous protection from government intrusion. Allowing the conduct here—to permit the sheriff to keep a casual user from walking off with sheriff property which can justifiably be assumed to contain information the sheriff department needs to process or to which members of the general public simply should not have access—will not diminish the amount of freedom and privacy guaranteed to the people by the state and federal constitutions.

Furthermore, the defendant fails to distinguish between his statements to Teeters and Teeters' statements to him. *Katz* involved eavesdropping contemporaneously on telephone conversations. There is nothing in *Katz* to suggest that one person can have a reasonable expectation of privacy in the words another person communicates to him during a conversation. A person has no control or authority over his co-conversationalist. The co-conversationalist's words are her own.

Given the factors considered above, it is clear that Rewolinski did not have a legitimate expectation of privacy, *i.e.,* that no search or seizure occurred. This finding is consistent with what this court stated in *State v.*

*Dombrowski,* 44 Wis. 2d 486, 171 N.W.2d 349 (1969). That is, a " ' "search implies a prying into hidden places for that which is concealed." ' " *Id.* at 495, quoting *Edwards v. State,* 38 Wis. 2d 332, 338, 156 N.W.2d 397 (1968). Furthermore, " 'A search implies an examination of one's premises or person with a view to the discovery of contraband or evidence of guilt to be used in a prosecution of a criminal action. The term [search] implies exploratory investigation or quest.' " *Dombrowski,* 44 Wis. 2d at 495, quoting *Haerr v. United States,* 240 F.2d 533, 535 (5th Cir. 1957). Thus, in this case, where the TDD printout and readout were at all times within view of the dispatcher, where the dispatcher plainly saw the printout bundled in the defendant's hand, and where the dispatcher was not searching for contraband or evidence of a crime, it can be said that no search occurred.

In conclusion, any expectation of privacy by the defendant was not reasonable. His temporary and outward possession of the printout tape by tearing it off of the sheriff department's TDD and bundling it in his hand does not endow him with a protected interest. Under the totality of the circumstances, the defendant did not have a legitimate expectation of privacy in the words he typed on the TDD and sent to Teeters, in the words she sent to him, or in the printout tape from the sheriff department's TDD machine. He assumed the risk attendant to using sheriff department telephone equipment located in the dispatch area for purposes of official business in the immediate presence of others.

### *WHETHER GOVERNMENT CONDUCT WAS REASONABLE*

If the defendant had established a legitimate expectation of privacy that was invaded by government

action, *i.e.,* that a search and seizure within the meaning of the fourth amendment took place, then the issue would be whether the search was constitutional. *Monahan,* 76 Wis. 2d at 395. Here, even if Rewolinski had a legitimate expectation of privacy, the action of the sheriff dispatcher was reasonable, especially in view of the "well-defined circumstances" of this case. It follows that there was no constitutional violation.

The United States Supreme Court has said that one factor to be considered in determining the reasonableness of the police conduct is whether at the time of the seizure the police knew that the item was evidence of a crime. *Cady v. Dombrowski,* 413 U.S. 433, 447 (1973); *State v. Dombrowski,* 44 Wis. 2d at 495–96. In this regard, it bears emphasizing that there was no crime in this case, let alone suspicion of a crime, when the dispatcher retrieved the printout tape. Nor could there be any knowledge of a crime. This fact alone suggests that the police conduct in this case was reasonable.

Nor did the dispatcher in this case know that the contents of the printout tapes she retrieved from the defendant would later become evidence of a crime. This also points to the reasonableness of her conduct. In *Illinois v. Rodriguez,* — U.S. —, 110 S. Ct. 2793, 2799 (1990), the Supreme Court emphasized that reasonableness under the fourth amendment does not demand that law enforcement officers be factually correct in their assessment of a situation. The judgment of the police officers at the time of the challenged conduct must be responsible, but it need not be correct. *Rodriguez,* 110 S. Ct. at 2799. The crucial question is whether the officer's response was objectively reasonable and understandable, that is, whether it was a reasonable response to the situation facing the officer at the time. *Rodriguez,* 110 S. Ct. at 2800.

In this case, the dispatcher had no way of predicting that the printout later would become evidence pertaining to a crime. She reasonably and understandably believed that she could not allow the defendant to walk off with the printout tape. She reasonably and understandably believed the tape belonged to the sheriff department and that it might contain information—from Rewolinski's conversations, or possibly from previous other conversations printed out on the continuous paper tape and not yet removed from the TDD—that needed to be assessed and which at least for the time being the department needed to preserve, for the purpose of logging and analyzing call activity. The evidence indicates the department did routinely save the printout tapes for later reference.[9]

---

[9]Police departments routinely record all incoming and outgoing calls in order to make sure their dispatches are accurate, to verify information, and to keep a log of emergency and non-emergency calls, and this practice is not considered illegal interception or electronic surveillance. *See, e.g. Greenfield v. Kootenai County,* 752 F.2d 1387, 1389 (9th Cir. 1985); *Jandak v. Village of Brookfield,* 520 F. Supp. 815, 822 (N.D. Ill. 1981); *People v. Canard,* 257 Cal. 2d 444, 466, 65 Cal. Rptr. 15, 29 (1967); *People v. Cole,* 186 Ill. App. 3d, 542 N.E.2d 1145, 1146 (1989).

The police have a legitimate need to keep records of calls, and to retain them long enough to log the calls, make notes, and to do whatever else is necessary to preserve important information and to serve the public. *See* Tobias, Police Communications, 449, 454 (1974); Fieler, Radio Dispatcher's Guide, sec. 3 (1980); Ekblom & Heal, The Police Response to Calls from the Public 25-29 (1982). *See also* Wileman, Model Policy Manual for Police Agencies 45-47 (1976). The processing of such information is important because, among other things, it tells the department where and how to allocate scarce resources with which to serve and protect the public. In this connection, the fact that a TDD and its printout tape recorded the conversation, rather than a tape

This sheriff department's TDD sometimes would malfunction when the printout feature was engaged by spontaneously printing out portions of previous sheriff department transmissions while ongoing conversations were being printed.[10] The dispatcher knew of this malfunction. She reasonably suspected that, because of the malfunction, the tape of the Rewolinski-Teeters' conversations might have contained not only Rewolinski's and Teeters' messages to each other, but also confidential police information and information about members of the public that the TDD recorded from previous transmissions and then printed out during the Rewolinski-Teeters' conversations. Rewolinski had no right to such information about the police and third parties. Indeed, the dispatcher arguably would have a responsibility to keep it from him. The TDD malfunction meant also that the sheriff department could not reasonably be expected to rely solely upon retrieving information from any internal memory feature of the TDD for the purposes of department records and logging; the department had not only a practice but also a legitimate need to save the printout tapes so as to piece together as fully as possible the information needed for the department's administrative purposes.

If the dispatcher had not taken possession of and retained the printout tape, but instead had read the lengthy tape at the time, torn off any portions pertaining to the defendant and then given the tapes to him, his complaint would have been that she read his private conversations and that she thereby had violated his right

recorder which would have recorded spoken words, is not constitutionally significant.

[10]It is apparent the TDD was malfunctioning because it repeated certain of the defendant's and Teeters' messages over and over on the printout of their conversations.

to privacy. Furthermore, the suggested task of sorting out and separating pertinent from impertinent information is one that the dispatcher should not reasonably be required to undertake "on the spot," while on active dispatch duty, occupied with more immediately demanding tasks such as monitoring police radio communications and receiving emergency calls directed to the sheriff department.

Finally, it bears noting that "[p]olice safety is of paramount importance in fourth amendment jurisprudence." *State v. Murdock,* 155 Wis. 2d 217, 237, 455 N.W.2d 618 (1990) (Abrahamson, J., dissenting). In this light, it is not unreasonable for a police officer to be concerned and to react in a measured way when members of the public pick up articles in police stations and take them into their own possession, and this is especially so with respect to restricted areas of police stations.

### HARMLESS ERROR DOCTRINE

Since we have determined that there was no constitutional violation in this case, we need not consider whether, if there had been a constitutional violation, it would have constituted harmless error. Nevertheless, we note that in the court of appeals Judge Thomas Cane found harmless error in this case, and we choose to comment briefly on the application of the harmless error standard set forth in *State v. Dyess,* 124 Wis. 2d 525, 543, 370 N.W.2d 222 (1985). Under *Dyess,* constitutional error is harmless if there is no reasonable possibility that the error contributed to the conviction. *Id.* at 543. The *Dyess* test is consistent with the "harmless beyond a reasonable doubt" standard of *Chapman v. California,*

386 U.S. 18, 24 (1967). *See State v. Grant,* 139 Wis. 2d 45, 73–74, 406 N.W.2d 744 (1987) (Day, J., concurring).

The defendant has claimed that Teeters' statements expressing fear that he would kill her, made during their TDD conversation a few hours before he did kill her, were indispensable to the prosecution's case—and devastating to the defendant—because they "directly contradicted the defendant's contention that he acted in the heat of passion." Accordingly, the defendant has argued, admission of "[t]he TDD transcript and evidence about it literally represented the difference between first-degree and manslaughter" in Wisconsin.[11]

The "heat of passion" argument that the defendant wishes to make has a subjective element and an objective element. *State v. Lee,* 108 Wis. 2d 1, 12, 321 N.W.2d 108 (1982). The district attorney conceded at trial that the defendant, subjectively, acted in the "heat of passion." With respect to the objective test, a defendant's heat of passion "must be the result of adequate provocation." *Id.* This "provocation must be such that would cause an ordinary, reasonable person to be overcome with emotion to the degree discussed in the *Johnson* line of cases." *Id., ref. Johnson v. State,* 129 Wis. 146, 108 N.W. 55 (1906). This court stated in *Johnson* that:

> [T]he heat of passion which will reduce what would otherwise be murder to manslaughter . . . is such mental disturbance, caused by a reasonable, adequate provocation as would ordinarily so overcome and dominate or suspend the exercise of the judgment of an ordinary man as to render his mind for the time being deaf to the voice of reason: make him incapable of forming and executing that distinct intent to take human life essential to murder in the first degree, and

---

[11]First-degree murder and manslaughter are codified at sec. 940.01, Stats. 1985–86 and sec. 940.05, 1985–86.

28

to cause him, uncontrollably, to act from the impelling force of the disturbing cause, rather than from any real wickedness of heart or cruelty or recklessness of disposition . . ..

*Id.* at 160.

Thus, the question under *Dyess* is whether there is any reasonable possibility that any error in admission of evidence led the jury to conclude, in effect, that Rewolinski did not meet the objective element of the manslaughter test. The defendant, of course, argues that there is a reasonable possibility that the admission of the evidence to which he objects resulted in the jury's conclusion that there was not "adequate provocation."

The defendant's argument appears not to address the objective prong of the manslaughter test relating instead to the subjective prong. Teeters' expression of fear of Rewolinski and desire not to see him simply do not appear closely related to the question of whether, objectively, there was "adequate provocation" by which an "ordinary, reasonable person" would be overcome with emotion. There certainly is no reasonable possibility that the challenged evidence led the jury to its conclusion that Rewolinski was not "adequately provoked." It did not "directly contradict" the defendant's argument or "literally represent" the outcome of the case. To the contrary, the evidence to which Rewolinski objects might be considered by a reasonable jury to be evidence that he was "adequately provoked" and thus that he did act in the "heat of passion" and so would be guilty of manslaughter instead of first-degree murder. *See, e.g., State v. Hoyt,* 21 Wis. 2d 184, 128 N.W.2d 645 (1964) (husband's violent and humiliating behavior toward wife could be taken by jury as basis for adequate provocation for her actions). Hence, there is no reasonable possibility

29

that the evidence led the jury to find him guilty of first-degree murder instead of manslaughter.

Furthermore, as Judge Cane clearly assumed, the district attorney may have been incorrect in arguing that Rewolinski met even the subjective element for heat of passion. Independent evidence in the record suggests there may have been no subjective heat of passion. The prosecution showed that the defendant did not kill in one, instantaneous moment of anger. Rather, he first strangled Teeters manually, putting his hands around and squeezing her neck. After that, he wrapped a belt around her neck and proceeded to tighten it around the neck until the belt broke. Finally, he took the time to fill a bathtub two-thirds full of water, dragged or carried Teeters into the bathroom, and placed her face down in the water.

Without objection, the jury learned that the victim had obtained a previous restraining order directed at the defendant, because the defendant had beaten her and made threats that he would shoot her if she did not go back to him. The jury heard, without objection, that as grounds for a temporary restraining order she sought on the day of her death, Teeters stated the defendant had tried to kill himself with a yellow rope and that he almost "put the rope to" her; that she was very frightened and that the defendant previously knew of and was making threats about killing or hurting Teeters' male friend.

In summation, there is no reasonable possibility that either the evidence or the prosecutor's brief references to it on cross-examination and in closing argument prejudiced the defense. Any error was harmless, beyond a reasonable doubt.

## EVIDENTIARY HEARING

The procedure used below was not perfect. Due to circumstances in this case, the trial judge did not conduct an evidentiary hearing out of the presence of the jury. An evidentiary hearing outside of the presence of the jury is statutory (under sec. 971.31(4), Stats.) and preferable, but it is not constitutionally required. *Cf. Watkins v. Sowders,* 449 U.S. 341 (1981) (hearing outside presence of jury on identification evidence not required). A remand for a hearing, although sometimes permitted,[12] is not necessary in this case.

Two motions to suppress were filed several months before trial. The motions were accompanied by a statement that a hearing would be requested later, if such were deemed necessary. The final motion to suppress, which included a stated request for a hearing, was not made until the day before the trial when no state's witnesses were present or available. The trial court during the trial did allow the tape into evidence and part of its contents revealed to the jury, but only after ruling on the suppression motion. The judge was satisfied there was no violation of the defendant's constitutional rights. The trial court did not deprive the defendant of the opportunity to testify, call witnesses or limit the questions asked. The defense made no such requests and in fact defense stated the procedure of the trial court was agreeable. The defendant in this case can be deemed to have waived his statutory right under sec. 971.31, Stats.

Moreover, the questions the defendant would now like to raise at a hearing pertain to his subjective expec-

---

[12]*See Upchurch v. State,* 64 Wis. 2d 553, 219 N.W.2d 363 (1974).

31

tation of privacy which is not dispositive on the question of his legitimate expectation of privacy. He does not show how the answers to his questions would be relevant to demonstrate that any subjective expectation of privacy was reasonable.

The rule permitting remand for a further evidentiary hearing serves the interest of finality. It is appropriately applied if failure to remand would unnecessarily result in reversal of a criminal conviction. Here, it could be shown on remand that, in fact, no error or harm occurred. The rule permitting remand should not be used simply to give a party the opportunity to do what it should have done before, that is, to show a legitimate expectation of privacy. We find the statutory procedures should be followed but that under the facts of this case, the defendant's interests were protected.

The defendant has not shown either a subjective expectation of privacy or a legitimate expectation of privacy. In addition, under the facts and circumstances of this case, the deputy sheriff did not act unreasonably in confiscating the TDD printout tape. There was no error that caused any harm to the defendant.

*By the Court.*—The decision of the court of appeals is affirmed.

SHIRLEY S. ABRAHAMSON, J. (dissenting). Because this court cannot determine from this record whether the defendant had a legitimate expectation of privacy in his communication on the telecommunications device for the deaf (TDD), I would remand the case for an evidentiary hearing on the defendant's suppression motion. After the circuit court holds the evidentiary hearing and makes findings of fact, the record

should be forwarded to this court for decision about the defendant's legitimate expectation of privacy.

A legitimate expectation of privacy is, according to United States Supreme Court cases, an expectation that society is prepared to recognize as reasonable. Majority op. at 16. As Professor LaFave points out, this statement is tautological. The fourth amendment protects those interests that may justifiably claim fourth amendment protection. LaFave, *Search and Seizure,* sec. 2.1(d), p. 314 (2d ed. 1987).

The answer to the question of what interests justify fourth amendment protection is a value judgment a court makes based on the totality of circumstances. "This question must be . . . answered by assessing the nature of a particular practice and the likely extent of its impact on the individual's sense of security balanced against the utility of the conduct as a technique of law enforcement." *United States v. White,* 401 U.S. 745, 786 (1971) (Harlan, J. dissenting). See also majority op. at 16.[1]

---

[1]The parties debate who has the burden of persuasion in this case. The state contends that this case involves both adjudicative and legislative facts. Adjudicative facts are ordinarily historical facts pertaining to the lawsuit; legislative facts ordinarily refer to the factual grounds for policy judgments. Adjudicative facts are generally proved in an evidentiary hearing. Legislative facts may be furnished the court through an evidentiary hearing or briefs or the court may obtain the facts on its own investigation of published sources. For discussions of adjudicative and legislative facts and the use of social science research, see sec. (Rule) 902.01, Stats. 1985–86; McCormick, *Evidence,* sec. 331 (3d ed. 1984), at 928; Walker and Monahan, *Social Facts: Scientific Methodology as Legal Precedent,* 76 Calif. L. Rev. 877 (1988); Walker and Monahan, *Social Frameworks: A New Use of Social Science in Law,* 73 Va. L. Rev. 559 (1987); Monahan and Walker, *Social Authority: Obtaining, Evaluating, and Establishing Social Sci-*

Since *Katz v. United States,* 389 U.S. 347 (1967), courts have recognized that society regards the expectation of privacy in the contents of personal communications as legitimate, even when the communication is from a public telephone booth.

The defendant argues that his telephone conversation with Catherine Teeters should be accorded the same fourth amendment protection as if he had gone out of the sheriff's department and used a public telephone. He argues that neither his deafness—which requires him to use a special type of telephone—nor the fact that he was in the sheriff's department should affect his fourth amendment right to personal communications without government surveillance.

The state argues that while society may recognize a legitimate expectation of privacy in personal communications made in other situations, society does not recognize any privacy interest in communications made on the department's telephone, in the dispatch area, in the presence of a deputy sheriff.

Missing in this case is a record of the totality of the circumstances from which a court may balance the competing interests of the individual's privacy of conversation and the utility of the conduct of the law enforce-

*ence in Law,* 134 U. Pa. L. Rev. 477 (1986); Davis, *Facts in Lawmaking,* 80 Colum. L. Rev. 931 (1980); Davis, *Judicial, Legislative, and Administrative Lawmaking: A Proposed Research Service for the Supreme Court,* 71 Minn. L. Rev. 1 (1986); *Florida v. Riley,* 488 U.S. 445, 465-66 (Brennan, J. dissenting).

The determinative legal issue, once the court has the adjudicative and legislative facts, is whether the facts meet the legal standard of legitimate expectation of privacy on the part of the defendant. The applicability of the burden of persuasion to deciding this question of law rather than to determining the facts is dubious.

ment officers in recording and keeping the record of the defendant's telephone conversation. The record is devoid of facts relating to communications involving the use of the TDD or any telephone located in the sheriff's department or particularly in the dispatch area.

Although sec. 971.31(4), Stats. 1987–88, requires that issues of fact raised by a suppression motion be decided by the circuit court without a jury and although the defendant made several requests for a hearing on his suppression motion, the circuit court did not grant a hearing. I think the circuit court erred in not holding a hearing.

Thus the record does not furnish adequate information about the operation of the TDD, the department's practice of monitoring incoming and outgoing conversations (of the hearing and the hearing impaired) on telephones located in the department or in the dispatch areas, and the needs of law enforcement to monitor telephone calls of both the hearing and hearing impaired who happen to be in the department but who are not under arrest. The record does not tell us, for example:

• whether the sheriff's department has any established policy about the use of the TDD;

• whether the sheriff's department routinely permits the hearing impaired to use the TDD;

• whether other TDD devices were readily available to the defendant outside the sheriff's department but in the vicinity of the sheriff's department;

• whether the defendant had used the department's TDD before June 9, 1987;

• whether the defendant knew how to disengage the printer on the TDD so that no printed record of the conversation was made. The court of appeals' opinion assumed, without factual proof, that the defendant knew how to disengage the printer and decided not to do so.

Court of Appeals, unpublished slip op. at 9 (Wis. Ct. App. Nov. 7, 1989);

• whether the sheriff's department regularly and customarily retains the TDD tape;

• whether the TDD had "a memory feature which recorded transmissions as well as producing the tape," majority op. at 19, although the majority opinion makes a finding of fact that the machine has such a memory feature;

• whether notices were posted in the sheriff's department near the telephone alerting users of the TDD (or any other telephone) about law enforcement officers' access to the conversations;

• whether calls placed to and from telephones in the dispatch areas are routinely monitored and recorded, although the state's brief, p. 36 and the majority op. at 21, conclude that they are;

• whether the sheriff's department had access to the telephone conversations of hearing persons using telephones in the department and whether the department treated telephone conversations of the hearing and of the hearing impaired in the same manner or in a different manner;

• why the sheriff's department recorded, if it did, conversations on telephones located in the department, including conversations made by members of the public who were not under arrest, and how the department used the recordings.

The state, the defendant, the majority opinion, and I agree that the court's decision on whether the defendant had a legitimate expectation of privacy must be based on the totality of the circumstances. Because the record is almost devoid of any of the "circumstances" needed to make a decision, I do not believe the court can

36

decide whether the defendant had a legitimate expectation of privacy. I would therefore remand for a hearing.

WILLIAM A. BABLITCH, J. (dissenting). The jury in this case did not have to decide whether Mr. Rewolinski committed a crime when he killed the woman he lived with, Catherine Teeters. The jury had only to decide whether it was first-degree murder or manslaughter. In deliberating this choice, the jury had before them the important piece of evidence at issue in this appeal: a private conversation between Rewolinski and Teeters three hours before she died that was transcribed on a telecommunications device for the deaf (TDD). This transcription, torn off the TDD by Rewolinski immediately after his second conversation with Teeters, was forcibly taken from him by a deputy as he was leaving the sheriff's department, but before he killed Teeters. After the crime, the deputy read the transcript, and it was subsequently received into evidence.

The majority concludes that Rewolinski's recorded conversation was not protected by the Fourth Amendment to the United States Constitution. Inasmuch as his conversation with Teeters did not enjoy the protections of the fourth amendment, the majority determines that the police had every right to seize the transcript, read its contents, and use it in any manner they saw fit, including the use of it in evidence against Rewolinski.

The issue before us is whether the protections of the fourth amendment apply to the recorded transcript of the telephone conversation on the TDD between Rewolinski and Teeters, both of whom were dependent upon the TDD for telephone communication due to their deafness.

I disagree with the majority for three principal reasons. First, this case involving basic privacy rights comes

to us from a very unique perspective. It involves privacy rights of the deaf. Yet the legal arguments presented to us, and the legal rationale set down by the majority, involve concepts of privacy that have evolved over the years in a world in which sound is a given. What are the reasonable expectations of privacy in a world without sound? Unless the issue is framed to take into account the very different world that is the world without sound, the issue is erroneously framed.

Second, I do not agree with the majority's conclusion that the fourth amendment does not apply to the tape of the TDD conversation. I conclude that the very important and fundamental interest of protecting conversational privacy from government intrusion is not offset by any societal interest in allowing the government to literally "seize" and examine without warrant this private telephone conversation. Accordingly, I would hold that this private telephone conversation, notwithstanding that it was made and recorded on a TDD, is subject to the protections of the Fourth Amendment to the United States Constitution.

Third, even if I agreed with the majority's conclusion that the fourth amendment did not apply to this taped conversation, I would write to express my disapproval with the analysis employed by the majority in determining the issue of whether there was a search within the meaning of the fourth amendment.

I.

This court is faced with an opportunity to embark on an uncharted course in an area of law sparsely developed: privacy rights of the deaf. The majority declines that challenge. The legal arguments presented to us by the state, and the legal rationale set down by the major-

ity, involve concepts of privacy that have evolved over the years in a world in which sound is a given.

But what of the world without sound? What of the world in which the approaching step that signals a presence cannot be heard? What of a world in which simple communication is dependent upon costly technological devices, or upon public displays called "sign" in which whispers of confidentiality are impossible?

What may be an unreasonable expectation of privacy in a world with sound may well be reasonable in a world without sound. Perhaps a hearing person who wishes to place a telephone call on a normal telephone in a police station a few feet from a police officer would not be entitled to the protections of the fourth amendment. If a person with normal hearing wishes to place a call, it may be reasonable to expect that person to go around the corner if he or she wishes privacy. But one will find few, if any, TDD's "around the corner." Other than in the home of another deaf person, the only likely place a deaf person will find a TDD is in the sheriff's department.

What is the response of the majority? The majority tells us that Rewolinski could have: (a) kept his conversation brief; (b) asked someone else to call for him; (c) asked for a ride home; (d) walked home; or (e) hired a ride home. *State v. Rewolinski,* majority op. at 20. Thus, the majority advises deaf citizens that if they wish to rely on a technology that will enable them to lead more independent and productive lives in a hearing dominated world, they must subject themselves to the choices of either opening up their conversation for public examination, limiting their conversation to purposes this court finds appropriate, returning to their former dependence on others to make their phone calls for them, or bypassing the technology's advantages altogether. It is only because Rewolinski is deaf and could not make a call

39

without using a government "phone" that a record of this call exists. To say that Rewolinski "assumed the risk" of having his conversation monitored when he had no reasonable alternatives, ignores reality. *See Rewolinski,* majority op. at 21. "It is idle to speak of 'assuming' risks in contexts where, as a practical matter, individuals have no realistic alternative." *Smith v. Maryland,* 442 U.S. 735, 750 (1979) (Marshall, J. dissenting).

If we are to be truly sensitive to our role of providing justice we must consider what "reasonable expectations" the deaf should have when using a TDD and what precautions adequately protect their TDD conversations from being exposed. On this basis alone, I would remand for a hearing, such as that proposed by the other dissenting opinion, to give us far more facts than the record before us reveals. As noted clinical writer and neurologist Oliver Sacks recently observed about our society, "[w]e are remarkably ignorant about deafness . . .. Ignorant and indifferent." O. Sacks, *Seeing Voices: A Journey Into the World of the Deaf* 1 (1989). I agree. We need to be enlightened to the realities of living in a world without sound, and how that world affects the protection of privacy to which we are all entitled.

## II.

The majority concludes that the forcible taking and examination of the TDD printout was not a search or seizure within the meaning of the fourth amendment because citizens do not enjoy a reasonable expectation of privacy in their telecommunications when the communication is made from government equipment at a government agency in the presence of a government official who "could have" acted to "oversee" the conversation. I disagree. Society's fundamental interest in protecting

conversational privacy necessitates application of fourth amendment standards to this case.

The application of the fourth amendment depends upon whether the person invoking its protection against unreasonable searches can claim a " 'justifiable,' a 'reasonable,' or a 'legitimate expectation of privacy' " that has been invaded by government action. *Smith,* 442 U.S. at 740. The focus in a "was-there-a-search" case within the meaning of the fourth amendment is on whether there is a privacy interest that should be or has been recognized as warranting fourth amendment protection. Thus, the Supreme Court has emphasized, "[t]he test of legitimacy is . . . whether the government's intrusion infringes upon the personal and societal values protected by the Fourth Amendment." *California v. Ciraolo,* 476 U.S. 207, 212 (1986) (quoting *Oliver v. United States,* 466 U.S. 170, 182–83 (1984)).

Therefore, the question of was-there-a-search is essentially a question of policy to be determined by weighing the societal interest in protecting the individual's asserted privacy interest against the societal interest in permitting police to engage in the conduct at issue, unrestrained by any fourth amendment requirement of reasonableness. *See Hudson v. Palmer,* 468 U.S. 517, 527 (1984); *State v. Stevens,* 123 Wis. 2d 303, 334, 367 N.W.2d 788 (1985) (Heffernan, C.J., dissenting).

Rewolinski asserts that the sheriff department's conduct invaded his right of conversational privacy in a telecommunication. In *Katz v. United States,* 389 U.S. 347 (1967), the Supreme Court made it explicit that the fourth amendment applies to telecommunications. It is the "contents" of telecommunications that *Katz* protects. *See Smith v. Maryland,* 442 U.S. at 741. The *Katz* decision "implicitly recognized that the broad and unsuspected governmental incursions into conversa-

41

tional privacy which electronic surveillance entails necessitate the application of Fourth Amendment safeguards." *United States v. United States District Court,* 407 U.S. 297, 313 (1972) (footnote omitted). The federal government itself has argued that private oral and electronic communications are, along with protection of the home and structures such as hotel rooms and offices, core privacy interests which should receive maximum protection from governmental search and seizure under the fourth amendment. *United States v. Chadwick,* 433 U.S. 1, 9 n.4 (1977). The proliferation of wiretapping statutes[1] further attests to society's broad recognition of the value and necessity of conversational privacy.[2]

---

[1]TDD conversations were not protected by Wisconsin's wiretapping statute at the time Rewolinski used the Pierce County Sheriff Department's TDD in 1987. Since that time, the statutes have been expanded in scope to include "electronic communication" which is defined as "any transfer of . . . writing . . . wholly or partially transmitted by a wire . . .." Section 968.27(4), Stats., 1987–88. The interception of electronic communication, including TDD communications, is subject to the same restrictions as wire or oral communications. *See* sec. 968.28–968.31, 1987–88.

The parties dispute whether Rewolinski's conversation would have been protected by the present wiretapping statutes in light of sec. 968.27(7)(a)2., Stats., which excludes electronic or oral communication "[b]eing used by a . . . law enforcement officer in the ordinary course of his or her duties."

[2]Cf. A Model Code of Pre-Arraignment Procedure, sec. 210.3(2) (1975), which holds the public's interest in conversational privacy in such high regard that it provides for a general prohibition against seizure of recordings made for personal communication:

> With the exception of handwriting samples, and other writings or recordings of evidentiary value for reasons other than their testimonial content, things subject to seizure . . . shall not include personal diaries, letters, or other writings or recordings, made solely for private use or communication to an individual occupying a family,

42

Our intellectual and emotional growth and our enjoyment of life are stimulated by and, indeed, require communication with others. In today's society, telecommunications play a vital role in our personal and professional relationships. Because conversations also have the capacity to manipulate, humiliate, and incriminate the individual when the words he or she speak are exposed to an unanticipated audience, privacy in our conversations is often essential to their value. As Justice Brandeis wisely reminded us, the makers of our Constitution recognized:

> the significance of man's spiritual nature, of his feelings and of his intellect. They knew that only a part of the pain, pleasure and satisfactions of life are to be found in material things. They sought to protect Americans in their beliefs, their thoughts, their emotions and their sensations. They conferred, as against the Government, the right to be let alone . . .. *Olmstead v. United States,* 277 U.S. 438, 478 (1928) (Brandeis, J., dissenting).

The continued vitality of a free society depends upon the interaction of ideas and emotions, both in public and in private, and it is the fourth amendment we rely upon to protect the private exchange of our thoughts. Any government interception of conversation threatens people's sense of security in the privacy of their personal conversations and interferes with the values inherent in that speech.

When weighing the competing societal interests involved in considering the question of was-there-a-search, "it is important to begin by specifying precisely the nature of the state activity that is challenged."

personal or other confidential relation, other than a relation in criminal enterprise, unless such things have served or are serving a substantial purpose in furtherance of a criminal enterprise.

*Smith* 442 U.S. at 741. The search in this case occurred when the sheriff's department examined the printout of Rewolinski's conversation to gather information regarding the contents of that communication. The record establishes that the contents of the printout were not fully examined by Deputy Roed until Rewolinski confessed to killing Catherine Teeters.[3] Contrary to the majority's assertion, there is no testimony that the printout was set aside for "logging" at a later time. There is no evidence that Pierce County routinely used printouts for logging. And most importantly, there is no reason advanced why logging calls represents an important societal interest that requires an examination of the entire contents of each call made from the TDD. The only apparent purpose for the examination of the printout at the time the examination of the contents of the conversation took place was to look for evidence. To do that, the police should have had a warrant. There was no exigency, the tape was not about to leave their possession.

Furthermore, Deputy Roed's inspection of the printout's contents constituted a search regardless of whether she was lawfully in possession of the printout.[4]

---

[3]The following is from public defender John Leonard's cross-examination of Deputy Roed:

Q: Okay. When did you first read the tapes?

A: I started reading them later on that evening but I didn't have a chance to finish with my other duties. I just threw it aside.

It is not clear whether "later in the evening" meant after Catherine Teeters's death had been reported or during the time between approximately 5:20 P.M. and 8:15 P.M. between Rewolinski's contacts with the sheriff's department. In any case, however, the tapes were not fully inspected prior to the homicide investigation.

[4]I believe the record is inadequate to determine whether the sheriff's department had lawful possession of the printout.

44

Legal possession of an article does not endow law enforcement officials with any concomitant authority to also search the contents of the article. *See, e.g., Walter v. United States,* 447 U.S. 649, 654 (1980) (Stevens, J. concurring), (stating that, "[t]he fact that FBI agents were lawfully in possession of the boxes of film did not give them authority to search their contents."); *United States v. Khoury,* 901 F.2d 948, 959–60 (11th Cir. 1990) (holding that an FBI agent's investigation of the written contents of a notebook that was lawfully in the possession of the FBI constituted a search that violated the defendant's fourth amendment rights).

Robert Rewolinski had a legitimate expectation of privacy because society's interest in protecting conversational privacy exceeds society's interest in the police conduct at issue here. Conversational privacy is a basic personal freedom protected by the fourth amendment. Curiosity and investigation are the only apparent reasons for the sheriff department's exploration of the contents of the printout they knew contained a personal phone conversation. Logging calls for administrative convenience is not the kind of overwhelming societal interest required to overcome the right of conversational privacy. Moreover, it is axiomatic that we cannot allow police practice to define the scope of the fourth amendment's protection.

Robert Rewolinski's thoughts and emotions should not become an open book subject to examination with-

Although I think it is unquestionable that the forcible taking of the printout from Rewolinski's clenched fist constituted a seizure because there was a meaningful interference with Rewolinski's possessory interest in the printout, *see United States v. Jacobsen,* 466 U.S. 109, 113 (1984); *State v. Friday,* 147 Wis. 2d 359, 374, 434 N.W.2d 85 (1989), I would remand on this issue to give the state the opportunity to show that this seizure was reasonable.

out warrant simply because he used government equipment to make a communication or because he was suspected of a crime. The state violated the defendant's constitutional rights just as surely as if it had broken into his home without a warrant and taken personal letters, just as surely as if it had tapped his telephone without a warrant to obtain evidence for trial. Accordingly, I conclude a search occurred within the meaning of the fourth amendment when Deputy Roed examined the contents of the printout. A warrant could have and should have been procured before the sheriff's department examined the personal communication between Rewolinski and the woman with whom he lived. The taped conversation on the TDD printout should not have been allowed into evidence.

## III.

I also wish to emphasize that even if I agreed with the majority's ultimate conclusion that there was no reasonable expectation of privacy, I would find it necessary to express my concerns regarding the analysis of the majority. The opinion reflects a questionable choice of precedent, an undue emphasis on property rights, and an overly narrow application of the term "knowingly expose." In essence, the reasoning the majority employs provides few clues as to what fact or facts in this case are relied upon to distinguish it from *Katz,* in which the Supreme Court found a reasonable expectation of privacy in the defendant's telecommunication. The majority's failure to specify which factor(s) are determinative of the was-there-a-search issue will cause confusion in the lower courts and provide little guidance to the law enforcement agencies of this state.

46

The cornerstone of the majority's entire analysis, the "*Fillyaw* factors," are largely irrelevant and inappropriate in this context because they are geared toward assessing the "reasonableness" of an asserted *spatial* privacy interest. The focus in *State v. Fillyaw,* 104 Wis. 2d 700, 312 N.W.2d 795 (1981), *cert. denied,* 455 U.S. 1026 (1982), was whether the defendant had a "legitimate expectation of privacy *in the invaded place,"* his girlfriend's apartment. *Id.* at 710 (emphasis added). *Fillyaw* addressed the question traditionally referred to as one of "standing."[5] Consequently, the *Fillyaw* factors emphasize property rights and the defendant's control over an area because they are significant when addressing whether a defendant may legitimately claim that his rights were violated by government intrusion into a place.

The *Fillyaw* factors are inappropriate here because Rewolinski does not claim that his property was invaded by the search or that police intruded into a "constitutionally protected area." "Petitioner's claim, rather, is that, notwithstanding the absence of a trespass, the State, as did the Government in *Katz,* infringed a 'legitimate expectation of privacy' that petitioner held." *Smith,* 442 U.S. at 741. The *Fillyaw* factors are directed at determining the validity of constitutional claims that the government intruded upon the defendant's expectation of privacy in a place. Accordingly, the *Fillyaw* factors are only useful for determining what the petitioner has already conceded—that he was not in a constitutionally protected area.

---

[5] "We note this summary [of the *Fillyaw* factors] as it may be useful to courts in determining *the standing* of defendants in other cases . . .." *Fillyaw,* 104 Wis. 2d at 711–12 n.6 (emphasis added).

The *Fillyaw* court was quick to point out that the factors it set forth are neither controlling nor exclusive. *Fillyaw,* 104 Wis. 2d at 711-12 n.6. Nor are they always relevant. As Justice Marshall emphasized in *Oliver v. United States,* 466 U.S. 170, 189 n.8 (1984) (Marshall, J., dissenting), "[t]he privacy interests protected by the Fourth Amendment are not limited to expectations that physical areas will remain free from public and government intrusion. (Citation omitted.) The factors relevant to the assessment of the reasonableness of a nonspatial privacy interest may well be different . . .." The fourth amendment "protects people, not places." *Katz,* 389 U.S. at 351. Different factors must be considered when assessing the reasonableness of a nonspatial privacy interest.

The majority's emphasis on the defendant's inability to exercise control over the TDD or the dispatch area also skews its perception of what activity "knowingly exposes" a conversation. *See* majority op. at 18. The majority seems to suggest that the presence of others during a telecommunication automatically opens that conversation up for interception by any available means. The risk, however, that accompanies making a phone call in a public place in the presence of others is that of being overheard or here, overseen; had Rewolinski's conversation been "overheard," he could not claim a reasonable expectation of privacy to those portions of the conversation that were overheard. Everyone understands this risk. There is not, however, any similar understanding that telephone conversations in public places, government owned or not, are recorded.

Moreover, there is a substantial distinction between information gathered by the naked ear or eye and information gathered through electronic means or other

48

means which enhance the senses.[6] Rewolinski has not "knowingly exposed" his conversation simply because there are bystanders who may oversee some portion of the conversation. "It is privacy that is protected by the Fourth Amendment, not solitude." *O'Connor v. Ortega,* 480 U.S. 709, 730 (1987) (Scalia, J. concurring). There is a dramatic difference, in privacy terms, between a conversation in which bits and pieces of information are sporadically revealed to an inattentive bystander and a focused police examination of the totality of that information accomplished through electronic recording.

Justice Harlan noted the greater intrusion posed by the interception of a conversation by electronic means:

> Authority is hardly required to support the proposition that words would be measured a good deal more carefully and communication inhibited if one suspected his conversations were being transmitted and transcribed . . . .. Much off-hand exchange is easily forgotten and one may count on the obscurity of his remarks, protected by the very fact of a limited audience, and the likelihood that the listener will either overlook or forget what is said, as well as the listener's inability to reformulate a conversation without having to contend with a documented record. All those values are sacrificed by a rule of law that permits official monitoring of private discourse . . . .. *United States v. White,* 401 U.S. 745, 787–89 (1971) (Harlan, J., dissenting) (footnote omitted).

[6]See *United States v. Taborda,* 635 F.2d 131, 139 (2d Cir. 1980), in which the court concluded that naked eye observations of the defendant's apartment from 190 feet away were admissible, but held that to the extent agents used a telescope to identify objects or activities that could not be identified without the telescope, those observations were improper. The court remanded the case to the district court to determine which observations were made with the naked eye.

Justice Harlan's observations are particularly persuasive under Rewolinski's circumstances. There apparently is no independent recollection by Deputy Roed of "overseeing" any of Rewolinski's conversation. She may never have had any direct view of the TDD screen. Furthermore, Rewolinski can control the information exposed to bystanders by tailoring his conversation when bystanders may see the conversation, by quickly ending the conversation, or by blocking the view of the screen.

Rewolinski did not knowingly expose his conversation by not turning off the printer. The reasoning of the majority indicates that the contents of the conversation would have been just as admissible had the officers recovered it from the TDD's memory. The printout, which resembles a cash register tape, would be more difficult for an observer to oversee than the half inch letters on the screen itself. The record does not even show whether Rewolinski knew he could stop the printer. Regardless, the inquiry should center upon whether Rewolinski took "normal" precautions. *See Rawlings v. Kentucky,* 448 U.S. 98, 105 (1980). "Normally," taking the only recording of a conversation that has not been overheard or, in this case, overseen, would protect its privacy.

Finally, although the majority initially acknowledges that societal interests must be balanced to assess whether the fourth amendment is implicated, it never engages in balancing, preferring instead to essentially address the was-there-a-search question by considering what privacy expectations a "reasonable man" would have under these circumstances. By continuing to view fourth amendment questions from this perspective, the majority fails to consider, let alone preserve, the values the amendment was designed to protect. When consider-

ing what is a "reasonable expectation of privacy," courts should focus on privacy interests rather than on privacy expectations in order to rationally reflect the purposes of the fourth amendment.

Focusing on expectations leaves open the opportunity for the "government by edict or by known systematic practice to condition the expectations of the populace in such a way that no one would have any real hope of privacy." *United States v. Taborda,* 635 F.2d 131, 137 (2d Cir. 1980). Justice Marshall issued a similar warning: "law enforcement officials, simply by announcing their intent to monitor the content of random samples of first-class mail or private phone conversations, could put the public on notice of the risks they would thereafter assume in such communications." *Smith,* 442 U.S. at 750 (Marshall, J. dissenting).

These warnings should be heeded. As I observed in *State v. Smith,* 149 Wis. 2d 89, 109, 438 N.W.2d 571 (1989) (Bablitch, J., dissenting), "[m]odern technology is quickly rendering the concept of privacy of communications of historic interest only. Nearly everything we say today, in our homes, on the streets, in our offices, is capable of being overheard by some form of listening device." The knowledge that the government has the ability to intercept the most private of conversations, even in a home or office, should not affect whatsoever the privacy interest a person has in those conversations, nor the protections the fourth amendment brings to them. As modern technology rapidly erodes the public's "expectations" of privacy, it is imperative that this court intercede when government conduct interferes with interests that should be or have been recognized as being protected by the fourth amendment, regardless of whether the "reasonable man" expects that privacy. Neither police policy nor modern technology should be

51

allowed to mold the public's expectations and dictate what is a reasonable privacy interest. As Professor Amsterdam observed, "neither *Katz* nor the fourth amendment asks what we expect of government. They tell us what we should demand of government." Amsterdam, *Perspectives on the Fourth Amendment,* 58 Minn. L. Rev. 349, 384 (1974).

I am authorized to state that CHIEF JUSTICE NATHAN HEFFERNAN joins in this dissent.