CAPITAL INVESTMENTS, INC., Plaintiff-Respondent, v. WHITEHALL PACKING COMPANY, INC., and others, Defendants-Appellants.

Supreme Court

*No. 76–683. Argued May 30, 1979.—Decided June 29, 1979.*
(Also reported in 280 N.W.2d 254.)

180

For the appellants there were briefs by *Bradley D. Armstrong, John Walsh* and *Brynelson, Herrick, Gehl & Bucaida,* of Madison, and oral argument by *Mr. Walsh.*

For the respondent there was a brief by *LaVern G. Kostner* and *Kostner, Ward, Galstad & Koslo,* of Arcadia, and oral argument by *LaVern G. Kostner.*

COFFEY, J. The plaintiff-respondent, Capital Investments, Inc., a capital risk lender (hereinafter Capital) commenced this action against Whitehall Packing Company, Inc., and its shareholders (hereinafter collectively referred to as Whitehall) seeking the specific performance of certain provisions of a financing agreement executed December 28, 1972. Capital alleged that in June, 1976 Whitehall breached the provisions of their contract by refusing to elect to its Board of Directors two de-

signees of Capital, as provided for in the conditions of the loan indenture. Whitehall contends that pursuant to the terms of the loan agreement Capital's right to Board representation was terminated in March, 1976.

During 1972 Whitehall became interested in the acquisition of a meat processing facility in Sioux Falls, South Dakota. Financing for this project was sought from Capital who submitted a memorandum proposal in November 16, 1972 outlining the terms and conditions upon which Capital would make the loan to Whitehall. During the succeeding month representatives of the parties met on several occasions to discuss the terms of the loan agreement. The Whitehall representatives, although objecting, were advised by their counsel to acquiesce in the board representation provision requested by Capital, lest they upset the proposed financing agreement.

On December 26, 1972 all of Whitehall's shareholders consented to and signed a document entitled an "Informal Action of Directors and Shareholders" authorizing the defendants' Board of Directors to enter into a $1,100,000 loan agreement with Capital. This memorandum document ("informal action") further provided for the amendment of Whitehall's Articles of Incorporation. The amendment adopted "The majority affirmative voting requirements permitted by sec. 180.25 of the Wisconsin Business Corporation Law. The document did not authorize the seating of any Capital representatives on the Whitehall Board of Directors.

Thereafter, Whitehall and Capital on December 28, 1972 entered into a financing contract denominated an "Agreement Respecting First Mortgage Notes and Warrants for the Purchase of Common Stock." The financing agreement, drafted by Capital's legal counsel, was essentially a detailed expansion of the November 16, 1972 memorandum proposal which had included Capital's request for board representation. The Terms of the fi-

nancing agreement provided that Whitehall would borrow $1,100,000 from Capital and three other investment companies (Moramerica Capital Corp., Catholic Family Life Ins. Co. and Abbott Capital Corp.). In consideration of the loan, Whitehall agreed to issue mortgage notes maturing December 12, 1985 and bearing interest at 11% per annum and to issue ten year Stock Purchase Warrants[1] on 436 shares of the corporation's common stock with a par value of $100. The purchase price for the stock subject to the warrants was to be determined by the stock's book value at the time the warrants were exercised. The contract specified that Capital would receive $500,000 worth of the mortgage notes and stock warrants for 242 shares of the Whitehall common stock. The loan contract set forth the division of the remaining notes and warrants among the other investment firms.

The language contained in Article 5.1 of the agreement further provided for Capital's right to designate two individuals to be elected to the five member Whitehall Board of Directors "so long as any portion of the stock is held by any of the Purchasers." ("Stock" refers to that purchased through the exercise of the Warrants.) This agreement, consistent with Capital's representation on Whitehall's Board of Directors, detailed that in certain areas of corporate management and control the two Capital designated directors would possess greater veto and decision-making powers than any of the other directors. Specifically, the prior written consent of the two Capital designated directors (referred to in the agreement as "The Noteholders' Representatives") was required in order for the appellant corporation to: (1) assume any further indebtedness or incur indebtedness to-

---

[1] "The term 'warrant' may broadly include 'right to subscribe' to the capital stock of a corporation at a fixed price either at a limited period or perpetually." Fletcher, Cyc. Corp. (Perm. ed.) §370.

talling in excess of $4,500,000; (2) effect a material change in corporate management; (3) authorize the payment of dividends or the purchase, redemption or acquisition of outstanding shares of Whitehall's capital stock; (4) authorize a recapitalization of the corporate financial structure; (5) increase officer or director compensation; (6) enter into an employment contract for a period greater than two years or providing for more than a $10,000 a year salary; (7) establish or enter into a pension or profit sharing program; (8) discount or sell accounts receivable; (9) purchase or lease any fixed asset having a cost of more than $10,000 per fiscal year; (10) lease or sell any substantial portions of the corporate assets, property or business; (11) acquire any new subsidiaries; (12) enter into any contract in the ordinary course of business with any person, partnership or corporation related to the immediate family of any Whitehall shareholder, director or officer; (13) permit any shareholder, director or officer to engage in a competitive business.

At the next shareholder's meeting following the execution of the agreement, two representatives designated by Capital were elected to Whitehall's Board of Directors. The Two Capital representatives continued to be elected to the Whitehall Board of Directors each of the succeeding years until 1976.

On March 31, 1975 Whitehall's indebtedness to the financing conglomerate was fully satisfied, thus extinguishing the mortgage notes. On March 6, 1976 Capital exercised all of its outstanding stock warrants and purchased a total of 242 shares of common stock. The exercise of Capital's right to purchase the stock warrants was in compliance with a 1974 contract modification that shortened the ten-year period for the stock purchase to one year following the satisfaction of the mortgage.

The total price for the 242 shares of stock was slightly more than $120,000 or a price per share of $496. Togeth-

er with the one share of stock Capital owned prior to the exercise of the stock warrants, Capital's 243 shares of Whitehall common stock represents slightly more than 15% of the outstanding voting shares in the corporation. The record is silent as to whether the remaining lenders (Moramerica, Catholic Family Life and Abbott) exercised the warrants they held pursuant to the 1972 agreement.

At the June, 1976 annual Whitehall corporate meeting including directors and shareholders, the two Capital representatives were not re-elected to the Board of Directors. The Whitehall shareholders relied on Article 14 of the 1972 agreement reciting that "All covenants, agreements, representations and warranties made herein . . . shall bind and inure to the benefit of the respective parties hereto . . . , so long as any of the notes or warrants are outstanding" in refusing to elect the two Capital representatives. Whitehall contends that with full payment having been made of the outstanding indebtedness to Capital and the other members of its conglomerate, extinguishing the mortgage notes, and the 242 stock warrants exercised, as of March 6, 1976 the contract obligation requiring two Capital representatives on the Board of Directors was termianted pursuant to Article 14 of the agreement.

The trial court rejected Whitehall's contentions finding no ambiguity between Articles 14, 5 and 5.1 of the agreement. The court further found that Article 14 providing for the continuation of the agreement "so long as any of the Notes or any of the Warrants are outstanding" did not control in terminating Capital's right to Board representation provided in Article 5.1 entitled "Representation on Board of Directors." The court noted the termination of the right to representation was specifically set forth in the following language of Article 5.1: "The obligations in this section shall continue in force as long as any portion of the Warranty Stock is held by

any of the purchasers." Therefore, the court concluded that even though all the mortgage notes had been paid in full and the Stock Warrants fully exercised, Capital as an owner of Warrant Stock was entitled to the election of two designees in June, 1976. The decision of the court further states that Capital's right to board representation will continue as long as any of the Warrant Stock purchasers hold the stock. The court also concluded that the terms of the long agreement, as ratified by subsequent corporate and shareholder action, constituted a lawful shareholder's agreement for the designation of two positions on the Board of Directors. The court noted that it is not contrary to public policy to recognize a substantial minority investment with voting rights disproportionate in comparison to its total stock holdings.

*Issues:*

1. Did the December 28, 1972 loan agreement provide that the respondent may designate two of the directors to be elected annually to the appellants' Board of Directors in perpetuity even though the loan's mortgage notes have been paid and all Stock Warrants exercised?

2. Is a provision in a corporate loan contract dealing with the selection of board directors and granting these directors greater voting rights contrary to the public policy underlying Ch. 180, Stats., the corporation's articles of amendments and bylaws?

The fundamental question raised by this appeal is whether there is an ambiguity existing between Articles 5 and 5.1 and Article 14 of the December, 1972 loan contract to the extent that each provision relates to the termination of Capital's right to have two designees elected to the Whitehall Board of Directors. The pertinent portions of the applicable contract provisions read as follows:

"5. *Covenants of the Company.* This company covenants and agrees *that from the date of this agreement and so long as any of the notes or any of the warrants are outstanding, and with respect to certain of the agreements set forth below so long as any of the Warrant*

*Stock is held by any of the Purchasers,* unless compliance therewith is waived in writing by the holders of at least 60% in amount of the Notes and Warrants and Warrant Stock outstanding."[2]

"5.1 *Representation on Board of Directors.* Two representatives of the Purchasers, designated on their behalf by Capital Investments, Inc. (herein called 'Capital') will be elected to and retained as members of the Board of Directors of the Company. Said representatives are herein sometimes referred to as the 'Noteholders' Representatives.' . . . *The obligations of this section shall continue in force as long as any portion of the Warrant Stock is held by any of the purchasers."* (Emphasis supplied.)

"14. *Survival of Provisions*

"All covenants, agreements, representations and warranties made herein and in any and all certificates and instruments delivered pursuant hereto or in connection herewith, shall survive the delivery to you of the Notes and Warrants *and shall bind and inure to the benefit of the respective parties hereto* and their successors and assigns *so long as any of the Notes or Warrants are outstanding."* (Emphasis supplied.)

The trial court found that the language in these three contract provisions did not create an ambiguity and that the last sentence in Article 5.1 expressly controlled the

---

[2] The trial court in its findings and decision from the bench issued January 5, 1977 noted that the introductory paragraph to Art. 5 is not a complete sentence and stated "The main clause is incomplete unless the period following 'outstanding' at the end of the sentence were to be made a colon, and then all of the subparagraphs were clearly shown to be, to relate back as part of the main clause." In 17A C.J.S., *Contracts,* sec. 306, p 159 it is explained that a court may provide the proper punctuation when construing a contractual agreement: "While the punctuation of a written sentence cannot be ignored, and may aid in determining meaning, it will not control over words or change a meaning which is plain from the whole document and the circumstances. To give effect to the party's intent the court may consider punctuation and may supply proper punctuation marks."

The lack of proper punctuation in Article 5 is of little or no significance in the instant case.

termination of Capital's right to representation. The appellants concede that each provision has a clear and definite meaning if the contract terms are considered individually. However, they contend when Articles 5, 5.1 and 14 are read in relation to each other and to the purpose of the entire agreement, it is unclear under what circumstances Capital's right to board representation is terminated.

It is the appellant's position that Article 14 is a comprehensive termination provision, stating that the contractual obligations in the agreement are terminated when there were no longer any mortgage notes or stock warrants outstanding. It is undisputed that the notes and warrants were no longer outstanding as of March 6, 1976. On that date Capital exercised their outstanding warrants in purchasing the Whitehall stock as the appellant corporation had retired the $1,100,000 indebtedness a year earlier.

The trial court found that Article 14 does not operate as a general termination clause, rather as a provision guaranteeing that the contractual obligations survive and continue in force after the delivery of the notes and warrants to Capital's financing conglomerate. Thus, Capital maintains there is no ambiguity in the contract as Articles 5 and 5.1 are exclusively applicable to the termination of their right to board representation.

█ We do not agree. Article 14 recites that "All covenants, . . . made herein . . . shall bind and inure to the benefit of the respective parties . . . , so long as any of the Notes or Warrants are outstanding." The last phrase in the provision describes a condition which if fulfilled, terminates the contractual obligations stated in the loan agreement. The language in Article 14 is unmistakable in stating that the parties ceased to be bound by the contract's covenants when all the mortgage notes and stock

warrants have been redeemed and executed. The scope of Article 14 as a general termination provision applies to "all covenants, agreements, representations and warranties" and therefore is applicable in terminating every contractual duty created by the financing agreement, including Capital's right to representation.

Thus, having established that Article 14 and Article 5.1 address the issue of the termination of Capital's right to Whitehall Board representation, we must determine whether there is an ambiguity between these contract provisions and, if so, which prevails.

In *Patti v. Western Machine Co.*, 72 Wis.2d 348, 351–352 (1976) this court defined the concept of contractual ambiguity in the following language:

"Words or phrases in a contract are ambiguous when they are reasonably susceptible of more than one meaning."

It has also been stated that matters relating to the interpretation of a contract and whether or not it is ambiguous are questions of law, thus, this "court may interpret the contract anew." *Zweck v. D. P. Way Corp.*, 70 Wis. 2d 426, 435–36, 234 N.W.2d 921 (1975) ; *Moran v. Shern,* 60 Wis.2d 39, 46, 208 N.W.2d 348 (1973).

Thus, we hold there is an inherent conflict between Article 5.1 and Article 14. Article 5.1 reads: "The obligations of this section shall continue in force as long as any portion of the Warrant Stock is held by any of the purchasers", while Article 14 recites: "All covenants, . . . shall bind and inure to the benefit of the respective parties hereto . . . so long as any of the Notes or Warrants are outstanding." Thus, each provision describes different conditions for the cessation of Capital's right to representation on Whitehall's Board of Directors.

Therefore, we hold the loan agreement is ambiguous, as the contract when read in its entirety, is susceptible to more than one meaning in dealing with the termination of the contract provision requiring the election of two Capital representatives on the Whitehall Board of Directors.

After a contract has been found to be ambiguous, it is the duty of the courts to determine the intent of the parties at the time the agreement was entered into. *Patti v. Western Machine Co., supra* at 353. In resolving the ambiguity and determining the parties' intent, the court may look beyond the face of the contract and consider extrinsic evidence. *Id.* at 351. Additionally, the court may rely on the canons of construction which are designed to ascertain the intentions of the parties entering into a contract. *North Gate Corp. v. National Food Stores, Inc.,* 30 Wis.2d 317, 140 N.W.2d 744 (1966).

A fundamental rule of contract construction that is a primary guideline in a court's consideration of a contract's ambiguity is that any ambiguity must be construed most strongly against the drafting party. *Strong v. Shawano Canning Co., Inc.,* 13 Wis.2d 604, 109 N.W. 2d 355 (1961). The American Law Institute's Tentative Draft No. 5, Restatement of Contracts, sec. 232, Comment A, explains the rationale for this rule of construction:

"Where one party chooses the terms of a contract, he is likely to provide more carefully for the protection of his own interests than for those of the other party. He is also more likely than the other party to have reason to know of uncertainties of meaning. Indeed, he may leave meaning deliberately obscure, intending to decide at a later date what meaning to assert. In cases of doubt, therefore, so long as other factors are not decisive, there is substantial reason for preferring the meaning of the other party."

The record clearly indicates that Capital and its legal representatives drafted the terms and conditions of the financing agreement and demanded as a condition precedent to the loan, board representation with excessive veto powers exclusively in their representatives. Thus, we are compelled to resolve the contract's ambiguity against Capital.

Further, in *Huck v. Chicago St. Paul M & O Ry. Co.*, 5 Wis.2d 124, 92 N.W.2d 349 (1958) the court stated the following principle of contract construction particularly applicable to the instant case:

"Ambiguities in an agreement must be construed in a manner consonant with its dominant purpose and conducive to the accomplishment of that purpose." *Id.* at 128. *See also: Siler v. Read Investment Co.*, 273 Wis. 255, 77 N.W.2d 504 (1956).

In this case, one of the purposes of the contract was the debt financing of the Sioux Falls acquisition and of equal importance was the provision giving Capital the right to board representation. This right of representation, coupled with the extraordinary decision-making powers granted the Capital designated board representatives, guaranteed Capital virtual control over Whitehall for the protection of their loan interest and the value of the stock, subject to the purchase warrants. The powers exercised by the Capital designated representatives in controlling the sale or acquisition of substantial corporate assets and subsidiaries, in limiting officer and director salaries, and in regulating the payment of dividends or the assumption of further indebtedness were designed to prevent corporate waste and mismanagement that would jeopardize Capital's investment.

The appellants persuasively argue that the underlying purpose for Capital's right to representation was extin-

guished at the time they had fulfilled their contractual obligations in retiring the mortgage notes and in exercising the stock options. Even though opposed to this contention, Capital concedes in its brief that they are no longer entitled to the extraordinary decision-making veto powers. However, Capital maintains it is still entitled to board representation in spite of the fact that the $1,-100,000 loan has been satisfied in full and its option rights exercised. The concession on the part of the respondent, Capital, as to the termination of the extraordinary powers highlights the inconsistency in its position that it has a continuing right to board representation. Capital's concession conclusively established that they agree it was no longer necessary to protect its negligible financial interests once the mortgage indebtedness was paid and the stock warrants exercised.

Therefore, we hold the purpose of the contractually mandated board representation was fulfilled with the payment of the mortgage notes and the exercise of the stock options. Moreover, in consideration of the foregoing factors, we cannot conclude that the owners of a closely held, family operated corporation would intend to bind themselves to a contract provision that serves no beneficial purpose to either party and undermines all principles of closely held corporate management.

Further, we do not conclude that it was the intent of the Whitehall shareholders and directors to permit Capital to secure the perpetual right of board representation. The respondent argues that their right to representation continued so long as they, or the other investors, own any of the Whitehall stock purchased with the exercise of the stock warrants, whether it be one share of stock or 436 shares. In light of the purpose of this loan contract, it is absurd to believe that Whitehall would intend

to give Capital and the remaining lenders, as corporate entities, the perpetual right to board representation by owning just one share of Whitehall stock. Clearly, there is no justification for permitting the unreasonable burden of forced representation to continue in perpetuity, especially when Capital has, at the very most, a negligible economic interest in Whitehall as the indebtedness had been satisfied and the stock warrants exercised. As was stated in the following from the *Bank of Cashton v. La Crosse County Scandanavian Town Mut. Ins. Co.,* 216 Wis. 513, 257 N.W. 451 (1934) unreasonable results should be avoided in a court's construction of an ambiguous contract:

"Where one construction would make a contract unusual and extraordinary, while another construction equally consistent with the language used, would make the contract reasonable, just and fair, the latter must prevail." *See also: Bitker & Gerner Co. v. Green Investment Co.,* 273 Wis. 116, 76 N.W.2d 549 (1956).

Additionally, in *Consumers Ice Co. v. United States,* 475 F.2d 1161 (1973) it was noted that courts will be reluctant to interpret a contract as providing for a perpetual contractual right unless the intention of the contracting parties to provide for the same is clearly stated. In that case, the Court of Claims was asked to determine the termination date of a government lease of real property pursuant to the following language: ". . . this lease shall in no event extend beyond June 30, 1964, or as long as required for Anti-aircraft purposes." The court held that the government could be evicted in the action commenced by the lessors in 1969 and stated:

"While it is clear that the terms of the lease do not specifically define a period of perpetuity, it is also clear that the lease could continue for such a long time as to constitute, for all practical purposes a perpetual right to occupation, should the government feel there was a con-

tinuing need for the land for the designated purpose. The fact that a contract leaves indefinite the period for performance will not usually invalidate it or make it unenforceable but the longer the period for performance the heavier the burden on the enforcing party to prove that the extended duration was intended. Thus, contracts for performance in perpetuity may be valid, but under certain conditions are considered unreasonable and contrary to public policy. 3 Corbin, Contracts, sec. 553 (1960). There is, therefore, an apparent judicial reluctance to interpret any contract to require performance in perpetuity, and some of this reluctance should carry over to situations in which there exists a visible possibility that a contract might extend in practical perpetuity. Such a possibility is a relevant factor in determining which of two competing interpretations is the most reasonable." *Id.* at 1166.

In the present case, we are compelled to determine that Capital's right to representation terminated in March, 1976. The only reasonable interpretation of this contract consistent with public policy is to hold that the parties intended to be bound by a termination condition stating a definite period for the fulfillment of the agreement rather than a perpetual right to board representation.

Therefore, we hold the ambiguity between Articles 14 and 5 must be construed against Capital, and that the parties intended Capital's right of board representation would terminate when Capital's financial interests were fully protected and there were no longer any mortgage notes or stock purchase warrants outstanding. Therefore, we hold Whitehall's interpretation of the Agreement that Article 14 controls the termination of Capital's right to board representation must prevail as it is the most reasonable, just and fair construction of the terms of the contract. Further, this interpretation resolves the ambiguity in the contract, clarifies the intent of the parties, and gives each provision in the contract full force

and effect. To the contrary, to find Article 5.1 controlling over the language in Article 14 would render the termination provision in Article 14 mere surplusage. In this regard, the court stated in *Herchelroth v. Mahar,* 36 Wis.2d 140, 153 N.W.2d 718 (1967):

". . . a construction of the agreement which gives reasonable meaning to all provisions is preferable to one which leaves part of the language useless, or inexplicable, or creates a surplusage." *Id.* at 147.

The respondent cites *Goldman Trust v. Goldman,* 26 Wis.2d 141, 131 N.W.2d 902 (1965) in arguing that the termination language in Article 5.1 must control, since Article 5.1 specifically addresses the issue of board representation and Article 14 is merely a general termination provision. In the instant case, the rule of construction that specific clauses should control over general provisions is not applicable as it would support an interpretation of the agreement that is contrary to the parties' intentions and would foster an unreasonable result, contrary to public policy. This reasoning would allow an outside group, with only a minimal financial interest, a perpetual right to representation in a closely held, family corporation.

Finally, in our consideration of this case, we believe the enforceability of Capital's contractual requirement of board representation, with these individuals exercising extraordinary decision-making powers is subject to challenge as contrary to public policy delineated in ch. 180, Stats. The language of the loan contract between Whitehall and Capital gave the two Capital designated representatives sitting on the 5-man board extraordinary powers of corporate management, including the power to veto further indebtedness, the sale or lease of substantial assets, an increase of compensation for officers and directors, the distribution of stock dividends, etc. This type

of contract between Whitehall and Capital providing that less than a majority of directors can manage and control the corporation may be an unlawful delegation of board power, contrary to the provisions of ch. 180.

In light of our holding that the ambiguity in the contract must be resolved in favor of the appellant and the language of the condition of termination set forth in Article 14 is controlling, in June, 1976 the Whitehall shareholders were free to decline to reelect the Capital designees to the board of directors.

*By the Court.*—Judgment reversed and cause remanded for dismissal of the complaint.