STATE of Wisconsin, Plaintiff-Respondent,

v.

Steven M. MILASHOSKI, Defendant-Appellant-
Petitioner.†

Supreme Court

*No. 90–0412–CR. Argued May 30, 1991.—Decided June 25,
1991.*

(Also reported in 471 N.W.2d 42.)

†Motion for reconsideration denied. Heffernan, C. J., did
not participate.

74

For the defendant-appellant-petitioner there was a brief and oral argument by *Steven P. Weiss,* assistant state public defender.

For the plaintiff-respondent the cause was argued by *Thomas J. Balistreri,* assistant attorney general, with whom on the brief was *James E. Doyle,* attorney general.

DAY, J. This case is before the court on a grant of a petition for review by Steven M. Milashoski of a court of appeals' decision. *State v. Milashoski,* 159 Wis. 2d 99, 464 N.W.2d 21 (Ct. App. 1990). The court of appeals affirmed a judgment and sentence of the circuit court of Walworth county, the Honorable Robert J. Kennedy and the Honorable John R. Race, judges, ruling that physical evidence taken from a fire scene, and a crime laboratory analysis of that evidence were not obtained in violation of Milashoski's fourth amendment rights. The court of appeals also upheld the circuit court's $15,000 fine against Milashoski for manufacturing a controlled substance contrary to secs. 161.41(1)(b) and 161.14(4)(n), Stats. 1987–88.[1]

---

[1] Section 161.41(1)(b), Stats. 1987–88 provides:

**Prohibited Acts A-penalties (1)** Except as authorized by this chapter, it is unlawful for any person to manufacture or deliver a controlled substance. Any person who violates this subsection with respect to: . . . (b) Except as provided in pars. (c) and (e) to (h), any other controlled substance classified in schedule I, II or III, may be fined not more than $15,000 or imprisoned not more than 5 years or both; . . .

Section 161.14(4)(n), Stats. 1987–88 provides:

**Schedule 1. . . . (4)** HALLUCINOGENIC SUBSTANCES. Unless specifically excepted under federal regulations or unless listed in another schedule, any material, compound, mixture or preparation which contains any quantity of the following hallucinogenic substances or their salts, isomers or salts of isomers, if salts, isomers or salts of isomers exist within the specific chemical designation, in any

The issues presented for review are: (1) Were Milashoski's right to be free from unreasonable search and seizure violated when firefighters removed several containers from a fire scene at Milashoski's father's residence and later sent them to the state crime laboratory for testing? and (2) Did the circuit court abuse its discretion in fining Milashoski, an indigent defendant, $15,000 for manufacturing a controlled substance?

We hold that Milashoski's fourth amendment rights were not violated because he had no reasonable expectation of privacy in the containers. Additionally, we hold that the $15,000 fine imposed on Milashoski was not an abuse of discretion.

The facts of this case are as follows. On July 3, 1986, an explosion occurred in the Milashoskis' vacation home in the Village of Fontana. Upon the arrival of the volunteer firefighters, some of whom were police officers,[2] the first floor of the structure was engulfed in flames, with some "combustion" visible on the second floor as well. After extinguishing a blaze in the kitchen, firefighters noticed heat underfoot and proceeded to the basement, where another fire was burning. After these flames had been doused, the firefighters conducted an "overhaul" of the basement. In an overhaul, the firefighters inspect the premises to make sure the fire is completely extinguished. They also salvage valuables if requested to do so by the owner.

During the overhaul, the firefighters saw what appeared to be laboratory equipment together with several liquid-filled containers in the immediate area where

form including a substance, salt, isomer or salt of an isomer contained in a plant, obtained from a plant or chemically synthesized: . . .. (n) Phencyclidine, commonly known as "PCP"; . . ..

[2]Fire Chief Robert Patek was also Chief of Police of the Village of Fontana at the time.

the fire had just been burning. The containers included two sealed one-gallon jugs labeled reagent alcohol and vegetable oil, one sealed five-gallon metal can of toluene, and two unmarked unsealed containers containing a clear liquid.

Milashoski, who had been occupying the house when the explosion occurred, had been burned, and was waiting in a neighbor's yard for medical help to arrive. When the firefighters asked him what had happened, he stated that he "was boiling some material for perfume and it exploded." (Transcript of Proceedings, January 17, 1989, p. 42.)

Knowing that the liquids in the labeled containers were combustible, and not knowing what was in the unlabeled containers, the firefighters removed all five containers from the basement to the yard next door as a precaution against further outbreaks. One firefighter, who had not been in the basement but was handed an unlabeled container, later became ill from the vapors the container emitted.

By the time the building was rendered safe, Milashoski had already been taken to the hospital. Upon leaving the scene, the firefighters took the containers to the Fontana safety building because they believed it was unsafe to put potentially dangerous chemicals back into a badly burned building or leave them in the yard "where somebody might have gotten hurt." The containers were placed in an area behind the safety building alongside a concrete retaining wall. They were kept outside because of the effect the contents of one of the containers had on the firefighter who became ill. To protect the containers from the elements, and to conceal them from the public, they were covered with a fifty-five gallon metal drum.

Later that evening, a Fontana police officer assigned to investigate the fire interviewed Milashoski in the hos-

pital. The officer testified at trial that Milashoski told him he did not know the nature of the containers found in the basement. Milashoski speculated that the containers may have been left in the basement by the previous owner of the home and that his father had not yet cleaned the items out.[3] He also told the officer that he would be in the hospital overnight for observation and that he would be returning to Illinois the following day.[4]

Four days later, the first working day after the fourth of July weekend, the authorities shipped the unmarked containers to the state crime laboratory in Milwaukee where their contents was analyzed. Two of the containers were filled with a concentrated form of bromobenzene, a carcinogenic substance. The third container held bromobenzene mixed with biphenyl and cyclohexanone, and phencyclidine, a controlled substance commonly known as PCP. *See* sec. 161.14(4)(n), Stats.

On June 18, 1987, the Walworth County District Attorney's office filed a criminal complaint against Milashoski, charging him with the manufacture of PCP, contrary to secs. 161.41(1)(b) and 161.14(4)(n), Stats. Following a preliminary hearing, Milashoski was bound over for trial, and an information was filed, alleging the same offense.

On May 31, 1988, Milashoski filed a motion to suppress physical evidence on the grounds that the evidence was seized without a warrant and in violation of the state and federal constitutions.

Following a hearing on September 19, 1988, the circuit court denied the suppression motion, stating:

---

[3]The record reveals that Milashoski's parents purchased the home in 1972.

[4]Milashoski did not return to Illinois, but spent the next afternoon salvaging possessions from the burned-out home.

I find that they had a right to seize it because it was seized during the fire and as a precaution. They had a right not to leave it in the yard, but to take it with them. The right of privacy is gone at that point. And they have a right, if they want to, to test it for any possible reason they have. Such as, they thought that maybe the combination of these three items had something to do with the bottle that caused the problem; or they felt it might shed some light on why the fire occurred; or whatever.

There is no particular right of privacy that the defendant has at that point.

(Transcript of Proceedings, September 19, 1988, pp. 19–20.)

The case proceeded to trial, and on January 19, 1988, a jury found the defendant guilty of manufacturing a controlled substance, as charged in the information.

On March 13, 1988, Milashoski appeared in court for sentencing. Before sentencing, the court considered, among other things, the presentence report, the sentencing guidelines, Milashoski's record,[5] his demeanor, the gravity of the offense,[6] the protection of the public, and Milashoski's rehabilitative needs. The court also considered Milashoski's debts, amounting to $14,200; his only asset, a truck which he valued at $800; and his employ-

---

[5] In 1978 Milashoski was fined by the Milwaukee County Circuit Court for possession of marijuana. His FBI record, which he denies, shows that in 1975, he was fined for shoplifting in Tempe, Arizona. In 1975, he was arrested in Oak Lawn, Illinois for possession of stolen property. Milashoski recalled that at the age of twenty-four, he was fined for driving while intoxicated in Cook County, Illinois.

[6] The presentence report stated that the PCP found in the home had an estimated street value of $30,000. This figure is disputed.

ment record, which the court described as "excellent."[7] The court stated:

> Therefore, under the circumstance, I have to accept the recommendation of the District Attorney and that is for a five year prison term in the Wisconsin State Prison, plus a $15,000 fine. The quantity gives me no other alternative.

(Transcript of Proceedings, March 13, 1989, p. 50.) The court also sentenced Milashoski to an additional six months in jail, consecutive to his criminal sentence, if he failed to pay the $15,000 fine by May 13, 1989.

On December 20, 1989, Milashoski filed a motion for post-conviction relief. The motion stated that the circuit court abused its discretion by imposing the $15,000 fine on Milashoski, an indigent defendant, and by failing to consider Milashoski's ability to pay the fine when it was imposed. Milashoski also objected to the six months in jail as a penalty for nonpayment of the fine by May 13, 1989.

The court amended the judgment of conviction, allowing Milashoski sixty days after his discharge from prison to pay the fine of $15,000. If Milashoski was unable to pay the fine within sixty days after his discharge, the judge said he could bring an appropriate motion before the court, and the court would exercise its discretion to determine whether the fine should be modified to reflect Milashoski's then current ability to pay. The court also vacated the penalty for nonpayment of the fine by May 13, 1989.

Milashoski appealed the judgment of conviction and post-conviction order. The court of appeals, addressing

---

[7]At the time of his arrest, Milashoski was employed as a sign painter for his father's business located in Alsip, Illinois. He was earning $8.00 an hour. He was also residing with his parents.

the question of the seizure and testing of the containers removed from the Milashoski basement, held that at trial, the State conceded the issue of standing to object to a search and seizure. *Milashoski,* 159 Wis. 2d at 108. The court also held that the containers were lawfully seized and tested pursuant to the "render safe" doctrine. Under the "render safe" doctrine:

> an owner forfeits any reasonable expectation of privacy that may inhere in his or her property when it is discovered by authorities responding to an emergency, and the property is either known to be dangerous or believed potentially dangerous to the investigating authorities or the public.

*Id.* at 116.

Milashoski petitioned this court for review which was granted on January 10, 1991.

Milashoski does not dispute the assertion that the firefighters had a right to remove the containers from the residence because they thought they might be dangerous. He claims, however, that once the containers were removed, he did not lose all property interests in them, allowing the firefighters to take the containers to the fire station and later have their contents tested. Milashoski supports this assertion by stating that the firefighters did not have a good-faith belief that the containers were too dangerous to leave on the premises, because they did not even know what the containers held. He claims in his brief, "[t]he testimony showed that the firefighters did not know what the containers held, had no idea what they held, and that they seized them just to find out what was in them." Milashoski asserts that "once the items were removed, the safety concerns (assuming there were legitimate concerns) were satisfied."

The record reveals that when the firefighters took the containers to the Fontana safety building, they seized them without a warrant. But the record also reveals that once the containers were removed from the residence, the fire chief believed it would have been unsafe to put them back, and he did not want to leave them in the yard where somebody might have gotten hurt. (Transcript of Proceedings, May 6, 1988, p. 64.) Milashoski had been taken to the hospital, so the fire chief could not leave the containers with him either.

The circuit court accepted the fire chief's explanation as fact. We do not consider this finding clearly erroneous, particularly in light of the circumstances of this case. That is, the firefighters had just extinguished two fires in the home, one in the kitchen and one in the basement. They found five containers near the fire in the basement, several of which contained liquids they knew to be combustible, the others which also contained liquids that may have been combustible. If the firefighters could remove the containers from the residence because they thought they "might be dangerous" as Milashoski states, it certainly would not have been safe to take them back to the scene of the fire where they could possibly cause another explosion. Moreover, a firefighter became ill from the fumes of the contents of one of the unlabeled containers. It would not have been safe to leave the containers in the yard, exposed to the public, where a neighbor or a passer-by could inhale the fumes or perhaps take the containers.

We note that the fire chief's explanation for taking the containers to the safety building is in accordance with sec. 213.095, Stats. 1987–88.[8] The applicable lan-

[8] Section 213.095, Stats. 1987–88 provides:

guage of the statute provides that the chief or other person in charge of a volunteer fire company may "do whatever may reasonably be necessary in the performance of their duties while engaged in the work of extinguishing any fire or performing any duties incidental thereto." *Id.* Such officers may also "do whatever may reasonably be necessary in the performance of their duties while engaged in the work of aiding persons or minimizing the loss to property at a first aid scene." *Id.*[9]

We hold that it would have been reasonably necessary for the firefighters to take the containers to the safety building to minimize any further loss to the residence, to protect the public who might be looking at the fire scene out of curiosity, or passers-by who might

---

**Police Power of fire chief, rescue squads.** The chief, chief engineer, assistant engineer, captain, lieutenant, executive officer or other person in charge of any volunteer fire company, association, fire district, or any other organization organized or created for the purpose of extinguishing fires and preventing fire hazards, or first aid calls involving either persons or property, shall have authority to suppress any tumult or disorder and to order all individuals or companies to leave the neighborhood of any fire or first aid scene, and to command from the inhabitants of the city or town all needful assistance for the suppression of fires and in the preservation of property exposed to fire; the officers above enumerated shall also have authority to go upon and enter any property or premises and to do whatever may reasonably be necessary in the performance of their duties while engaged in the work of extinguishing any fire or performing any duties incidental thereto. Such officers shall also have authority to go upon and enter any property or premises and do whatever may reasonably be necessary in the performance of their duties while engaged in the work of aiding persons or minimizing the loss to property at a first aid scene.

[9]The statute was amended by chapter 300 of the Laws of 1965, which deleted, among other things, language requiring the firefighters to be "on duty at a fire or in response to an alarm for a fire."

observe the containers, and for the safekeeping of the containers themselves.

Milashoski states that the firefighters did not know what the containers held, so therefore they were not justified in taking them; but not knowing the contents of the containers is a justification in and of itself for removing them to the safety building, since they were found near the fire, next to some laboratory equipment at the scene of an explosion, and the fumes made one firefighter ill. Had the firefighters left the containers in the yard, and someone had gotten sick, or had they put them back in the house and another fire started, surely they would be exposing themselves to accusations of negligence.

We hold that under the police power of the fire chief, enumerated in sec. 213.095, Stats., it was reasonable for the firefighters to seize the containers and remove them from the yard to the safety building. Because we rely on sec. 213.095 as a basis for our holding, we do not consider the "render safe" doctrine, which the court of appeals applied.

Once the firefighters removed the containers to the safety building, our second inquiry is whether they had the authority to have the contents of the containers tested without a warrant. Milashoski argues that the warrantless testing of the contents of the containers was unconstitutional. He claims that there was no legitimate basis to support the state crime laboratory's analysis, because no exigent circumstances existed, and the containers were not tested under the suspicion that they were criminal evidence. Milashoski states that the containers should have been returned, untested to him, noting that the day after the fire, he was salvaging property from the fire scene.

What Milashoski fails to mention, however, is that when he was interviewed in the hospital, he asserted that he had no idea what was in the containers, and that they were most likely there from the previous homeowner. We view this assertion as being unequivocally inconsistent with a privacy interest in the containers.

■■

As this court stated in *State v. Rewolinski,* 159 Wis. 2d 1, 12, 464 N.W.2d 401 (1990), whether the government's conduct was an unreasonable search in violation of the state and federal constitutions "depends, in the first place, on whether the defendant had a legitimate, justifiable or reasonable expectation of privacy that was invaded by the government action." The reasonableness of the government's conduct does not even come into question unless and until it is established that the defendant had a legitimate expectation of privacy. *Id.*

> The determination of whether the defendant had a reasonable expectation of privacy depends on two separate questions. The first question is whether the individual by his conduct exhibited an actual, subjective expectation of privacy. The second question is whether such an expectation is legitimate or justifiable in that it is one that society is willing to recognize as reasonable.

*Id.* at 13. The defendant bears the burden of proof on both questions. *Id.* at 16. The standard of proof is a preponderance of the evidence. *Id.*

First, Milashoski's conduct must have exhibited an actual, subjective expectation of privacy in the containers. Granted, by the time the firefighters removed the containers to the safety building, Milashoski was already in the hospital and did not have an opportunity to express an interest in the containers. Since the contain-

ers were found in Milashoski's parents' home, in which he claimed he had been "making perfume," it certainly would have been reasonable for the firefighters to at least suspect, if not assume, that the containers probably belonged to Milashoski. But when he was asked about the containers in the hospital, Milashoski stated that the chemicals he was working with in the kitchen burst into flames, and he had no idea what was in the containers in the basement. He speculated that they could have been left there by the previous owner. His statement to the officer who was interviewing him does not exhibit an actual, subjective expectation of privacy in the containers. In fact, his statement would lead a reasonable person to believe that the containers were not his at all. Milashoski's assertion to the officer (which turned out to be untruthful) was inconsistent with a subjective expectation of privacy. We note that even at trial, Milashoski reiterated that the chemical containers found in the basement were already there when his family bought the house.

Not only did Milashoski's conduct not exhibit "an actual, subjective expectation of privacy," but even if it can be successfully argued that it did, such an expectation is not "one that society is willing to recognize as reasonable" because of the suspected hazardous and toxic nature of the contents of the containers. As the State points out, sec. 100.37(5), Stats. 1987–88[10] allows the Department of Agriculture, Trade and Consumer

[10]Section 100.37(5), Stats. 1987–88 provides in part:

**Hazardous substances act. . . . (5)** If the department has reasonable cause to believe that any substance is in violation of this section or poses an imminent hazard to public health or safety, it may deliver to the owner or custodian thereof an order prohibiting the sale or movement of such substance until an analysis or examination has been completed.

Protection to analyze or examine any substance which it believes "poses an imminent hazard to public health or safety," or is in violation of sec. 100.37.[11] In addition, sec. 144.77(4), Stats. 1987-88[12] allows the Department of Natural Resources or its representatives to remove or dispose of any abandoned containers of hazardous substances. It would be logical to first determine what the substances are in order to properly dispose of them in a manner compatible with environmental concerns; and in the case before us, Milashoski was "returning to Illinois," so the authorities could not go to him to determine what the substances were.

These above statutes represent the public policy concerning hazardous, toxic, and unsafe substances. We conclude that the firefighters acted consistently with this policy in having the contents of the containers tested, and that society is not prepared to recognize as reasonable an expectation that potentially hazardous and toxic chemicals will not be analyzed by some arm of the government. Under the facts, any expectation of privacy Milashoski may have had in the containers is therefore unreasonable. We conclude therefore, that the warrantless testing of the contents of the unmarked

[11]"Hazardous" substances as defined in sec. 100.37(1)(c), Stats., include those which are flammable or combustible, or can be reasonably foreseen to be ingested by children. "Toxic" substances, as defined by sec. 100.37(1)(k), Stats., include those which have the capacity to produce illness through inhalation.

[12]Section 144.77(4), Stats. 1987-88 provides:

**Abandoned containers. . . . (4) REMOVAL OR OTHER EMERGENCY ACTION.** The department or its authorized representative may contain, remove or dispose of abandoned containers or take any other emergency action which it deems appropriate under the circumstances.

containers found in the basement of the fire scene was not unconstitutional.

Finally, Milashoski argues that the $15,000 fine imposed upon him was an abuse of discretion because he was indigent and therefore had no current or foreseeable ability to pay such a fine.

Before the circuit court imposed the fine, it considered Milashoski's assets, liabilities, and employment record. Then the sentencing judge (Judge Kennedy) stated his reasons on the record, for imposing the $15,000 fine:

> If we are talking about quantities of three or four hundred hits [individual doses of the drug], it would have been bad enough, but I might have been able to concede to less. Of this 10,000 hits and potential of another 100,000, there's no way we're going to send an appropriate message unless it's the maximum sentence. That's my sentence.

(Transcript of Proceedings, March 15, 1989, p. 50.)

On February 5, 1990, before the circuit court ruled on modification of the fine, the court (Judge Race) read the sentencing record which contained Judge Kennedy's reasons for imposing the maximum statutory fine. Judge Race found that Judge Kennedy had not abused his discretion, but considering *State ex rel. Pederson v. Blessinger,* 56 Wis. 2d 286, 289, 201 N.W.2d 778 (1972) and *Will v. State,* 84 Wis. 2d 397, 402, 267 N.W.2d 357 (1978), he gave Milashoski sixty days, upon release from prison, to either pay the $15,000 fine or bring a motion for modification, based on his then current ability to pay. (Under *Pederson* and *Will,* "one who has been convicted of a crime and fined is not to be imprisoned in satisfaction of the fine or in lieu thereof if he is unable to pay the fine." 84 Wis. 2d at 402.) He also vacated the six

month jail penalty for not paying the fine by May 13, 1989.

We hold that neither Judge Kennedy nor Judge Race abused their discretion in imposing the $15,000 fine. First, Judge Kennedy was of the opinion that the $15,000 amount was necessary in order to send a message to the public that this type of behavior will not be tolerated. Second, when Judge Race modified the fine, it had the effect of creating an indeterminate fine. That is, the $15,000 represents the maximum Milashoski would ever have to pay, but this amount could be reduced, depending on Milashoski's financial status when he is released from prison. The modification of the fine takes into account Milashoski's indigency, but also takes into account his "excellent" employment record, and prospects of continuing his employment at his father's business when he is released from prison. That way, if he cannot pay the entire $15,000 when he is released, the court can set up an individualized payment plan which suits Milashoski's needs. *See Will*, 84 Wis. 2d at 406–407.

We conclude therefore that the $15,000 fine imposed on Milashoski, as modified by the circuit court, for manufacturing a controlled substance, was not an abuse of discretion.

*By the Court.*—The judgment of the court of appeals is affirmed.