PARK BANCORPORATION, INC., a Wisconsin corporation, Plaintiff-Respondent,†

v.

Martha W. SLETTELAND, Defendant,

George B. SLETTELAND, Defendant-Appellant.

Court of Appeals

*No. 91–2289. Submitted on briefs December 3, 1992.—Decided February 1, 1994.*

(Also reported in 513 N.W.2d 609.)

†Petition to review denied.

131

For the defendant-appellant the cause was submitted on the briefs of *Clay R. Williams* and *William J. French* of *Gibbs, Roper, Loots & Williams, S.C.*, of Milwaukee.

For the plaintiff-respondent the cause was submitted on the briefs of *Jon P. Axelrod, William D. Mollway*, and *Cynthia A. Curtes*, of *DeWitt, Porter, Huggett, Schumacher & Morgan, S.C.*, of Madison, and *Michael Ash* of *Godfrey & Kahn, S.C.*, of Milwaukee.

Before Sullivan, Fine and Schudson, JJ.

SCHUDSON, J.   George B. Sletteland appeals from an order granting summary judgment in favor of Park Bancorporation, Inc. Because we conclude that he had standing to challenge his ex-wife's sale of stock, we reverse.

## I.   FACTUAL BACKGROUND

Park Bancorporation, Inc., ("Park") is a holding company which, at all times relevant to this case, owned The Park Bank of Madison. On May 8, 1984, Park issued a certificate to Martha W. Sletteland ("Martha") for 2,603 shares of its corporate stock. At that time, Martha's husband, George B. Sletteland ("George") was Park's corporate secretary.

On January 12, 1989, George and Martha were divorced. Their divorce judgment incorporated a "Marital Settlement Agreement" that, in part, provided:

> 4.   As a full, fair, final and complete property settlement in lieu of any and all maintenance to either party, maintenance being specifically denied herein, the property of the parties shall be divided as follows:
>
> TO PETITIONER [MARTHA]
>
> . . . .
>
> 2,603 shares of Park Bancorporation, Inc. stock provided that upon sale of said stock petitioner shall receive the first $185,000.00 in net cash proceeds, the next $25,000.00 in net cash proceeds from said sale shall be placed into an interest bearing account to be utilized as a college and child support fund for the minor child of the parties; . . . it is further agreed that the balance of net sale proceeds, if any, beyond the $210,000.00 total hereinbefore referred to shall be awarded to respondent.

136

### DIVESTITURE OF PROPERTY RIGHTS

11. Each party shall be divested of and waives, renounces and gives up pursuant to sec. 861.07 all rights, title and interest in and to the property awarded to the other. All property and money received and retained by the parties shall be the separate property of the respective party free and clear of any right, title, interest or claim of the other party and each party shall have the right to deal with and dispose of his or her separate property as fully and effectively as if the parties had never been married.

On October 11, 1989, Park offered to purchase the stock from Martha for $337,843. George learned of that offer and believed it was substantially below the fair market value. Thus, on October 16, 1989, he notified Park that he held a "substantial, equitable and beneficial interest in the 2603 shares of Park common stock" and that he retained authority to "solely control all determinations as to whether such stock shall be retained or sold, including without limitation the exclusive right to determine the terms of sale, if any." Martha did not accept Park's offer, and the offer expired.

Approximately five months later, Martha decided to accept Park's original offer, and a contract was prepared on March 23, 1990. At the scheduled closing of March 28, 1990, however, Martha's lawyer advised Park that Martha had instructed him not to proceed with the transaction. Thus, Martha did not sell the stock to Park. As a result, on April 10, 1990, Park brought suit against George and Martha in Dane County Circuit Court seeking specific performance to compel Martha to sell the stock to Park, and a declaratory judgment that George "has no rights in the March

23, 1990 Contract which allow him to prevent it from being specifically performed."

On July 23, 1990, George filed an answer and counterclaim seeking rescission of the stock purchase contract and alleging securities fraud against Park:

> In making its offer to purchase the Shares to Martha Sletteland, Park employed a devious scheme and artifice to defraud, made untrue statements of material fact and omitted to state material facts necessary to make their statements not misleading, and engaged in acts, practices and a course of business which, if the Contract were to be enforced, would operate as a fraud or deceit upon Martha Sletteland and George Sletteland, all in violation of §§ 551.41 and 551.59, Wis. Stats.

In reply to George's counterclaim, Park asserted that George lacked "legal capacity and/or standing" to make such claims because: (1) George was not a party to the contract; (2) Martha, who was a party to the contract, was in default and could not raise the allegations; (3) under the judgment of divorce, Martha had been awarded the shares and retained the absolute right to sell them; and (4) any interest George had was solely between Martha and himself, and thus he had no authority to interfere in the contract between Martha and Park. Based on these assertions, Park moved for summary judgment.

On September 21, 1990, while the summary judgment motion was pending, George and Martha executed the Second Amendment to their Marital Settlement Agreement ("amendment") that stated that its purpose was:

> to correct an ambiguity and make clear the parties original intent that the 2,603 shares of Park Ban-

corporation, Inc. stock awarded to Petitioner [Martha] . . . were awarded to Petitioner solely to assure the payment by Respondent [George] of $185,000 to Petitioner . . . and to further assure that the Respondent established a $25,000 college and child support fund, . . . and to make clear that such stock was returned to Respondent . . . .

Pursuant to the amendment, George "paid the $210,000 debt owing to Martha" in exchange for the stock. On October 25, 1990, upon the stipulation of George and Martha, the amendment to the marital agreement was approved by the Milwaukee County Circuit Court, without notice to Park and, apparently, without the Milwaukee County Court's knowledge of the underlying lawsuit in Dane County. On January 15, 1991, the Dane County Circuit Court ordered venue changed to Milwaukee County.

On June 19, 1991, after learning of the amendment to the martial agreement, Park filed a second motion for summary judgment. It renewed the earlier claims and further sought summary declaratory judgment to declare the amendment void. In response, George filed a motion to extend the time to respond to Park's summary judgment motion, and to conduct discovery pursuant to § 802.08(4), STATS. The trial court denied George's motion to extend and conduct discovery and granted Park's motion for summary judgment.

## II. THE TRIAL COURT DECISION

In an oral decision, the trial court concluded that George lacked standing to challenge the stock transaction between Martha and Park because:

it's a clear marital agreement that gives that ownership to Martha. It does not give him, George

anymore than an equitable interest. He has no ownership under the marital agreement.

. . . .

. . . [P]aragraph 4, paragraph 11, . . . unequivocably [*sic*] confirm that Martha has absolute control of the stocks, and that George only . . . has an equitable charge . . . not a pledge.

The trial court further concluded that the second amendment to the marital agreement had "no effect" because:

that second agreement . . . is null and void under sec. 767.32. . . . [I]t would [ ] radically alter the property division provisions. It is not a mere clarification . . . it is clear that it is a major alteration, radical alteration as opposed to clarification, and it is prohibited. . . . Martha is estopped from executing this agreement. It is a void judgment and can't be validated by consent or waiver.

The trial court, in order "to tie this matter up and have it complete," also confirmed an earlier default judgment that had been entered against Martha when she failed to appear to contest Park's motion for specific performance.

### III. STANDARD OF REVIEW

We review a summary judgment *de novo. Capitol Indem. Corp. v. Reasbeck*, 166 Wis. 2d 332, 336, 479 N.W.2d 247, 249 (Ct. App. 1991). This review entails the same methodology applied by the circuit court. *Voss v. City of Middleton*, 162 Wis. 2d 737, 748, 470 N.W.2d 625, 629 (1991). The court must examine the pleadings to determine whether a claim has been stated and whether a material issue of fact exists.

*Grams v. Boss*, 97 Wis. 2d 332, 338-39, 294 N.W.2d 473, 477 (1980). The party moving for summary judgment has the burden of establishing the absence of a factual dispute and entitlement to judgment as a matter of law. *Grosskopf Oil, Inc. v. Winter*, 156 Wis. 2d 575, 581, 457 N.W.2d 514, 517 (Ct. App. 1990). Doubts as to the existence of a genuine issue of material fact should be resolved against the party moving for summary judgment. *Grams*, 97 Wis. 2d at 338-39, 294 N.W.2d at 477. If the material presented is subject to conflicting interpretations or reasonable people might differ as to the significance, it is improper to grant summary judgment. *Id.* at 339, 294 N.W.2d at 477.

## IV.   DISCUSSION

George appeals the order granting summary judgment arguing (1) that the amendment to the marital agreement was not void and did confirm his contention that he was a pledgor retaining equitable interest in the stock and, therefore, (2) that he had standing to challenge Martha's intended stock transaction with Park. Park responds that the trial court correctly concluded that the amendment was void, and that paragraph 11 of the original marital agreement established Martha's absolute control over the stock, thus precluding George's standing.

We need not decide whether the amendment was valid because we conclude that, *under the original settlement agreement,* George shared an equitable interest with Martha in the first $25,000 over $185,000 to establish the college and child support fund, and that George retained an additional, equitable interest in the value of the stock over $210,000. Therefore, given his counterclaim that Martha's intended sale

was induced by fraud, he was entitled to have the trial court determine whether his shared and separate interests were being devalued or destroyed by the intended transaction.

■

Although paragraph 11 of the original settlement agreement divests George of "all rights, title and interest income to the property awarded to" Martha, that provision necessarily applies only to the first $185,000 because, as the parties agree, under paragraph 4 of the settlement agreement, George retained an equitable interest in the stock. The first $185,000 realized from the sale would go to Martha, but the next $25,000 would go to the college and child support fund, and every additional dollar to George. We conclude that these interests give George standing to challenge the sale of the stock.

Although the parties agree that George retains an equitable interest in the stock, they disagree about whether George's interest should lead this court to label him a "seller," "trustee," "owner," "beneficial owner," "pledgor" or something else. Park argues that George "merely holds an equitable charge[,]" and thus his "interest is limited to a lien on the proceeds from the stock sale which exceed $210,000." Park further argues that an "equitable charge" creates no fiduciary relationship between George and Martha, and thus "Martha had absolutely no obligation to deal with the stock for George's benefit." Critically, however, Park concedes that because George had an equitable interest in the stock, "Martha was free to deal with the stock in any manner she wished, *so long as she did not commit waste.*" (Emphasis added.)

142

That is precisely the point. Whether George's interest might be labelled that of "seller," "trustee," "pledgor," or any of the other terms bandied about by the parties, the fact remains that Martha cannot waste George's interests. Regardless of the terminological turnstile through which we enter the analysis, if Martha was fraudulently induced to sell the stock for less than market value, the resulting sale would waste George's equitable interests. It is this right to protect his equitable interest from waste that spawns George's standing to challenge the sale of stock.

Initially, the trial court reached the same conclusion:

> Remember he has equitable interest. *She cannot waste.* . . . I think it's true. She has a duty, but it's more . . . of a negative thing. *She should not waste the property*, destroy it in some way. But she has no duty to enhance his equitable interest, to make it greater than it may be under the normal circumstances.

(Emphasis added.) The trial court erred, however, when it then elaborated, "I think there would [need to] be *a clear showing she completely wasted the stocks*. But . . . I don't find that here." (Emphasis added.)

At no point would George have to show that Martha's sale to Park "completely wasted the stocks." Ultimately, he would only have to show a reduction in the value over $185,000. Further, at the summary judgment stage, George would not have to make "a clear showing" that the intended sale wasted his equitable interest. Rather, at this stage, he must merely show that material factual issues remained regarding whether the intended sale was induced by fraud,

resulting in at least some waste. We conclude he has done so.

Although no Wisconsin cases have decided whether one in George's circumstances has standing to protect equitable interests against waste resulting from a stock sale allegedly induced by fraud, we reach our decision that George has standing consistent with well-established principles.

The concept of "waste" more frequently and typically is applied to realty. *Pleasure Time, Inc. v. Kuss*, 78 Wis. 2d 373, 381, 254 N.W.2d 463, 467 (1977) ("Waste may be defined as the unreasonable conduct by the owner of a possessory estate that results in physical damage to the real estate and substantial diminution in the value of the estates in which others have an interest."). Nevertheless, economic interests in corporate stock also can be "wasted" by mismanagement which results in a "diminution in the value" of the stock. *See Candee v. Egan*, 84 Wis. 2d 348, 368, 267 N.W.2d 890, 900 (1978). *See also Capital Inv., Inc. v. Whitehall Packing Co.*, 91 Wis. 2d 178, 191, 280 N.W.2d 254, 260 (1979). Further, "waste" of stock can result from fraud. *See RCM Secs. Fund, Inc. v. Stanton*, 928 F.2d 1318, 1324 (2d Cir. 1991) (stockholders filed derivative suit, alleging that fraudulent transaction wasted corporate assets and constituted a breach of fiduciary duty).

"Whether a particular act is waste depends on the circumstances." *Pleasure Time*, 78 Wis. 2d at 381, 254 N.W.2d at 467. Thus, looking at the circumstances in this case, it is possible that Martha would have committed "waste" if, as the result of fraud, she engaged in

the "unreasonable conduct" of selling her stock for less than its value and thereby effected a "substantial diminution in the value" of George's interests. *Id.*

To have standing, "[a] person may be an aggrieved party even though he or she is not a named party to a suit if he or she has a substantial interest adverse to the judgment or order." *In re J.S.P.*, 158 Wis. 2d 100, 107, 461 N.W.2d 794, 796 (Ct. App. 1990). This court will not construe the law of standing narrowly or restrictively. *State v. Milashoski*, 159 Wis. 2d 99, 107, 464 N.W.2d 21, 24 (Ct. App. 1990), *aff'd*, 163 Wis. 2d 72, 471 N.W.2d 42 (1991). The essence of the standing inquiry is whether the party seeking to invoke the court's jurisdiction has alleged a personal stake in the outcome which is at once related to a distinct and palpable injury and a fairly traceable causal connection between the claimed injury and the challenged conduct. *Id.*

George has done so. Indeed, we note that under the terms of the Marital Property Agreement, George could very well be the only person with an incentive to challenge the intended sale. After all, regardless of any possible fraud, as long as the purchase price was at least $225,000, Martha would have no financial incentive to challenge the transaction. We conclude that George's potential for loss if Martha is fraudulently induced to waste the stock by selling it for less than market value meets this test. *Cf. Madison Consultants v. Federal Deposit Ins. Corp.*, 710 F.2d 57, 61 (2d Cir. 1983) (defaulting pledgor of stock sold at direction of pledgee has standing under Rule 10b-5 of securities act to allege violation even though pledgor only has partial right to sale proceeds.).

145

The trial court also denied George's motion for additional discovery under § 802.08(4), STATS. Because we hold that under the circumstances alleged, George has standing to challenge the sale of stock on the basis of fraud, we also hold that the trial court erred in denying his motion for additional discovery. Upon remand the trial court is directed to grant George's motion for additional discovery. After additional discovery is conducted, the trial court can then revisit summary judgment and determine whether there are any genuine issues of material fact regarding George's fraud allegations. Accordingly, the order granting summary judgment for Park is reversed and the case remanded for further proceedings consistent with this decision.

*By the Court.*—Order reversed and cause remanded.

FINE, J. (*concurring*). Mr. Sletteland has standing to complain and attempt to prove that the price at which Park Bancorporation seeks to purchase the stock is less than its fair market value, irrespective of whether he can prove fraud. Certainly, he would be harmed equally if the low price was the result of ignorance or negligence, for example, as well as fraud, and has standing to protect his interest. The trial court should, however, protect the parties against loss if Mr. Sletteland cannot prove his allegations. If warranted, for example, the trial court could in the exercise of its reasoned discretion: require Mr. Sletteland to provide security to Mrs. Sletteland if the fair market value of the stock should fall and the bank seeks to withdraw its offer; permit Mr. Sletteland to bid against the bank for the stock, with the funds distributed as provided for in

the Marital Settlement Agreement; or permit the bank to purchase the stock, but award to the college fund and Mr. Sletteland, according to their respective interests, damages equal to the fair market value of the stock, less what the bank pays.